OPINION
{¶ 1} Defendant-appellant, Warren Waddy, appeals from a judgment of the Franklin County Court of Common Pleas denying his petition for post-conviction relief pursuant to Atkins v.Virginia (2002), 536 U.S. 304 and State v. Lott,97 Ohio St.3d 303, 2002-Ohio-6625. Because defendant set forth sufficient evidence to entitle him to an expert and an evidentiary hearing, we reverse and remand for further proceedings.
 {¶ 2} On September 25, 1987, a jury found defendant guilty of various crimes, and the trial court sentenced him to death. On appeal, this court affirmed. State v. Waddy (Nov. 2, 1989), Franklin App. No. 87AP-1159. In State v. Waddy (1992),63 Ohio St.3d 424, the Ohio Supreme Court affirmed this court's decision, and the United States Supreme Court denied certiorari in Waddyv. Ohio (1992), 506 U.S. 921.
 {¶ 3} On June 6, 1995, defendant filed a petition for post-conviction relief pursuant to R.C. 2953.21. Defendant raised 15 claims for relief, including a claim that he was mentally retarded; the trial court dismissed defendant's petition without an evidentiary hearing. Specifically, the trial court determined res judicata barred defendant's mental retardation claim because defendant could have raised the issue on direct appeal. The trial court further found insufficient evidence to support the claim. On appeal, this court affirmed. State v. Waddy (June 10, 1997), Franklin App. No. 96APA07-863.
 {¶ 4} The United States Supreme Court subsequently held inAtkins that executing mentally retarded persons is "excessive and that the Constitution places substantive restrictions on the State's power to take the life of a mentally retarded offender." Id. at 321. In so holding, the court acknowledged that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus" that execution is unconstitutional. Id. at 317.
 {¶ 5} Although Atkins determined execution of mentally retarded persons to be unconstitutional, it did not establish procedures for determining if a person is mentally retarded. Rather, Atkins allowed the states to develop appropriate means to enforce the new constitutional restriction. Lott, supra. Accordingly, the Ohio Supreme Court in Lott set forth the appropriate procedures for determining whether an accused is mentally retarded for purposes of an Atkins claim.
 {¶ 6} Lott established the post-conviction relief procedures outlined in R.C. 2953.21 et seq. as the statutory framework for reviewing an Atkins claim when a defendant was tried before Atkins was decided. If, however, the defendant filed the claim within 180 days of the Lott decision, Lott
prescribed the burden of proof to be by a preponderance of the evidence, as opposed to the more rigorous clear and convincing standard of proof normally required for an untimely or successive post-conviction petition. Id. at ¶ 21.
 {¶ 7} Lott determined that "[c]linical definitions of mental retardation, cited with approval in Atkins, provide a standard for evaluating an individual's claim of mental retardation." Id. at ¶ 12. Accordingly, Lott set forth a three-part test for determining mental retardation underAtkins. Whether asserting a claim in the post-conviction context or during the original trial, a petitioner must demonstrate: (1) significantly sub-average intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. Id.
 {¶ 8} As to the first prong, the court held that, although IQ alone is not determinative, "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Lott, at ¶ 12. Under the second prong, the court defined adaptive behavior as the collection of conceptual, social, and practical skills that people have learned so they can function in their everyday lives. According to the American Association on Mental Retardation ("AAMR"), conceptual skills include language, reading, writing, money concepts and self-direction. The AAMR's examples of social skills include interpersonal relationships, responsibility, self-esteem, gullibility, naiveté, following rules, obeying laws, and avoiding victimization. The AAMR includes as practical skills such daily activities as eating, mobility, bodily elimination, dressing, meal preparation, housekeeping, transportation, taking medication, money management, and telephone use, as well as occupational skills and the ability to maintain a safe environment.
 {¶ 9} Lott further instructed the trial court to conduct a de novo review of the evidence, "rely on professional evaluations of [defendant's] mental status, and consider expert testimony, appointing experts if necessary, in deciding [the] matter. The trial court shall make written findings and set forth its rationale for finding the defendant mentally retarded or not mentally retarded." Id. at ¶ 18. As the Supreme Court explained, "[w]e believe that these matters should be decided by the court and do not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e. the judge, not the jury, decides the issue)." Id.
 {¶ 10} On May 30, 2003, within 180 days of Lott, defendant filed a second petition for post-conviction relief alleging he is mentally retarded. The trial court initially appointed the Ohio Public Defender ("PD") to represent defendant, denying defendant's motion to appoint defendant's present counsel. On October 17, 2003, the PD filed a motion for funding to obtain a mental retardation expert; the state opposed the motion. On April 23, 2004, the trial court denied defendant's motion. In the meantime, the PD obtained an expert, Dr. Luc Lecavalier, Ph.D., Assistant Professor of the Department of Psychology at The Ohio State University. The PD filed a motion to suspend adjudication on defendant's Atkins petition and the state's motion to dismiss until Dr. Lecavalier reviewed defendant's records. The trial court granted the motion and held the case in abeyance until July 15, 2004. On July 15, 2004, the PD filed a notice voluntarily dismissing defendant's petition.
 {¶ 11} On July 20, 2004, defendant's present counsel filed a motion to withdraw the notice of voluntary dismissal; the state opposed the motion, and the PD filed a motion to withdraw as appointed counsel. On July 20, 2005, the trial court allowed defendant to withdraw the notice of voluntary dismissal. In the same entry, the court allowed the PD to withdraw as counsel and appointed defendant's present counsel. In a second entry of the same date, the trial court dismissed defendant's petition without an evidentiary hearing. The trial court found that because defendant was trying to use the evidence from his 1995 petition to prove his Atkins claim, the evidence, insufficient in 1995, likewise was insufficient to prove an Atkins claim.
 {¶ 12} The trial court also held that res judicata barred defendant's mental retardation claim. Although it recognizedLott's holding that res judicata did not bar Lott's mental retardation claim, the trial court distinguished Lott because "Lott did not involve a defendant who had already litigated and lost a mental retardation claim. In the case at hand, the Court has already determined that Defendant's evidence was insufficient to warrant relief." (Trial Court Opinion, at 3.) Further, because this court affirmed the trial court's 1996 decision dismissing defendant's mental retardation claim, the trial court concluded the law of the case doctrine precluded defendant from pursuing his claim in a second post-conviction petition. Lastly, stating that borderline mental retardation does not satisfy Atkins andLott, the court found significant that defendant never was diagnosed as mentally retarded.
 {¶ 13} Defendant appeals, assigning the following errors:
ASSIGNMENT OF ERROR NO. 1:
THE TRIAL COURT'S RULING THAT A PRE-ATKINS AND PRE-LOTT DETERMINATION THAT APPELLANT WAS NOT MENTALLY RETARDED MET THE PARAMETERS OF ATKINS, IS THE LAW OF THE CASE, AND IS THEREFORE RES JUDICATA ON THE ISSUE IS ERRONEOUS, IS UNSUPPORTED BY THE EVIDENCE AND IS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH ANDFOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AS WELL AS ARTICLEI, SECTION 2, 10 AND 16 OF THE OHIO CONSTITUTION AND THE HOLDING OF STATE V. LOTT, 97 Ohio St.3d 303 (2002).
ASSIGNMENT OF ERROR NO. 2:
THE TRIAL COURT'S DENIAL OF FUNDING FOR A MENTAL RETARDATION EXPERT VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION, EFFECTIVE ASSISTANCE OF COUNSEL, AND FREEDOM FROM ARBITRARY, CRUEL AND UNUSUAL PUNISHMENT. U.S. CONST. AMENDS. V, VI, VIII, IX AND XIV; OHIO CONST. ART. 1, §§ 1, 2, 5,9, 10, 16 AND 20[.] ADDITIONALLY, SUCH DENIAL WAS AN ABUSE OF THE TRIAL COURT'S DISCRETION.
ASSIGNMENT OF ERROR NO. 3:
THE OHIO COURT'S IDENTIFICATION OF A SINGLE, ARBITRARY IQ SCORE OF 70 TO CREATE A REBUTTABLE PRESUMPTION THAT A DEFENDANT IS NOT MENTALLY RETARDED IF HIS IQ SCORE IS ABOVE THAT NUMBER VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT, AS WELL AS THE RIGHT TO DUE PROCESS, THE RIGHT TO EQUAL PROTECTION, AND THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS. THE PRESUMPTION HERE OPERATED TO DENY WARREN WADDY HIS CONSTITUTIONAL RIGHTS.
ASSIGNMENT OF ERROR NO. 4:
WARREN WADDY WAS ENTITLED TO HAVE HIS CULPABILITY WITH RESPECT TO THE DEATH PENALTY DECIDED BY A JURY WHICH REFLECTS THE CONSENSUS IDENTIFIED BY THE SUPREME COURT IN Atkins v.Virginia. THE REFUSAL OF THE TRIAL COURT TO ORDER A NEW SENTENCING HEARING DENIED WARREN WADDY RIGHTS TO DUE PROCESS, EQUAL PROTECTION OF THE LAW, EFFECTIVE ASSISTANCE OF COUNSEL, AND THE RIGHT TO BE FREE FROM THE IMPOSITION OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR NO. 5:
THE PROCEDURE SET FORTH IN State v. Lott AND FOLLOWED BY THE TRIAL COURT FAILS TO PROVIDE CONSTITUTIONALLY ADEQUATE PROCEDURES FOR THE DETERMINATION OF MARK BURKE'S [sic] MENTAL RETARDATION. BOTH THE EQUAL PROTECTION CLAUSE AND THE SIXTH AMENDMENT REQUIRE A JURY DETERMINATION OF MENTAL RETARDATION.
 {¶ 14} Because the third, fourth, and fifth assignments of error are raised only to preserve them for purposes of further appeal, we first address them. In the third assignment of error, defendant claims that Lott's rebuttable presumption is unconstitutional insofar as it presumes a petitioner is not mentally retarded if his or her full-scale IQ score is above 70. We, however, must adhere to the law and procedures the Ohio Supreme Court set forth. Cooke v. Montgomery Cty.,158 Ohio App.3d 139, 2004-Ohio-3780, at ¶ 39 (noting that "[a]ppellate courts are bound by and must follow the decisions of the Ohio Supreme Court, which are regarded as law unless and until reversed or overruled"); State v. Tinker, Franklin App. No. 03AP-1203, 2005-Ohio-2289. Because Lott established the rebuttable presumption, defendant's third assignment of error is overruled.
 {¶ 15} Defendant's fourth assignment of error asserts he is entitled to a jury that reflects the national consensus identified in Atkins to determine his culpability with regard to the death penalty. Nothing in Atkins or Lott mandates that the trial court hold a new sentencing hearing. Rather, if the trial court determines a defendant is mentally retarded, the defendant cannot receive the death penalty. Because nothing inLott requires a new sentencing hearing, defendant's fourth assignment of error is overruled.
 {¶ 16} Relying on Ring v. Arizona (2002), 536 U.S. 584, defendant's fifth assignment of error contends the procedures set forth in Lott to determine defendant's mental retardation, followed in the trial court, are unconstitutional to the extent they do not require that a jury determine whether he is mentally retarded. Lott, however, held that mental retardation is a question of fact for the judge, not a jury, to determine. Because Ohio Supreme Court precedent dictates our decision, defendant's fifth assignment of error is overruled.
 {¶ 17} Defendant's first assignment of error maintains the trial court erred in concluding that because defendant raised a mental retardation claim in his first post-conviction petition, the law of the case required application of res judicata to bar his Atkins claim. Defendant asserts that res judicata does not apply because individuals sentenced to death prior to Atkins
did not have the opportunity to fully litigate and present a claim of mental retardation as an absolute bar to the death penalty. Lott, at ¶ 20.
 {¶ 18} The state responds that res judicata bars (1) any claim in post-conviction that was or could have been raised at trial or on direct appeal, and (2) any post-conviction claims that previously were dismissed or denied in an earlier post-conviction proceeding. The state argues that because defendant's 1995 petition for post-conviction relief attempted to assert mental retardation as a complete bar to the death penalty and was denied, defendant now is precluded from raising the same claim.
 {¶ 19} Under the doctrine of res judicata, constitutional issues cannot be considered in post-conviction proceedings where "they have already been or could have been fully litigated" by the defendant, while represented by counsel, either before conviction or on a direct appeal. Lott, supra, citing State v.Perry (1967), 10 Ohio St.2d 175. Courts similarly have held that where a defendant unsuccessfully raises a claim in a post-conviction petition, res judicata precludes the defendant from raising the same claim in a subsequent post-conviction petition. State v. Frye (Nov. 10, 1997), Franklin App. No. 97APA01-106, appeal not allowed, (1998), 81 Ohio St.3d 1453;State v. Pasturzak (Dec. 17, 1998), Scioto App. No. 98CA2587;State v. Mootispaw (Mar. 26, 1998), Lawrence App. No. 97CA26.
 {¶ 20} In Lott, the state argued that res judicata barred Lott's claim of mental retardation. Id. at ¶ 19. The Supreme Court held the doctrine did not apply where "Lott lacked the opportunity to fully litigate his mental retardation claim. Admittedly, he could have raised mental retardation as a mitigating factor during the penalty phase of the trial, but not as a complete bar to the death penalty. Lott also did not haveAtkins' guidance as to what constitutes mental retardation. Thus, under these circumstances, we hold that res judicata does not bar Lott's claim of mental retardation. Moreover, due processnow requires consideration of Lott's evidence of mental retardation before he is executed." Id. at ¶ 20. (Emphasis sic.)
 {¶ 21} The state attempts to distinguish Lott, arguing that defendant, unlike Lott, attempted to claim mental retardation as a bar to the death penalty in his 1995 petition for post-conviction relief. Although defendant attempted to argue such a claim in his first petition, prior to Atkins, as the trial court concluded in denying defendant's 1995 petition, defendant could not have succeeded in barring his execution on the constitutional basis that he is mentally retarded. At most, defendant's mental retardation, if proven, would have been a factor mitigating against the imposition of the death penalty.
 {¶ 22} As a result, the evidence submitted with defendant's 1995 post-conviction petition was not used to determine whether defendant is so impaired as to fall within the range of mentally retarded offenders whose execution is prohibited under theEighth Amendment. See State v. Bays, 159 Ohio App.3d 469,2005-Ohio-47, at ¶ 23 (stating that "[a]lthough the expert testimony presented at Bays' mitigation hearing regarding his intellectual limitations is relevant to Bays' Atkins claim, it was not developed either to prove or to disprove the issue presented by his Atkins claim — whether Bays is so impaired that his execution would constitute cruel and unusual punishment"); State v. Hughbanks, 159 Ohio App.3d 257,2004-Ohio-6429, appeal not allowed, (2005), 105 Ohio St.3d 1500
(holding that evidence used in the penalty phase of trial was offered as evidence of a mental illness in mitigation and not to determine whether petitioner was so impaired that theEighth Amendment prohibited the execution); State v. Lorraine,
Trumbull App. No. 2003-T-0159, 2005-Ohio-2529, appeal not allowed, 107 Ohio St.3d 1697 (stating that res judicata did not apply where the mitigation hearing during the penalty phase of petitioner's trial did not address the three-part test for mental retardation set forth in Atkins and Lott, as petitioner did not have a full opportunity to address the issue of mental retardation under the Atkins and Lott standards).
 {¶ 23} Further, as in Lott, the record from the 1995 petition does not indicate what standards were applied when defendant was evaluated. We cannot assume the Lott standards were used simply because a similar version of the three-prong test adopted in Lott existed at the time of defendant's 1995 petition and may have been used by psychologists and psychiatrists prior to Atkins and Lott. In this case, nothing indicates that the expert evidence from defendant's 1995 petition was presented or developed to establish defendant's mental retardation status using the test adopted in Lott. Bays, supra. Because defendant did not have the opportunity to fully litigate his mental retardation claim as a constitutional bar to the death penalty, res judicata does not preclude defendant's present claim. Due process requires consideration of defendant's evidence of mental retardation before he is executed. Lott, supra. Defendant's first assignment of error is sustained.
 {¶ 24} Defendant further contends the trial court erred in dismissing his petition without conducting an evidentiary hearing, and in his second assignment of error he contends the trial court erred in failing to provide funding for a mental retardation expert. The state responds that the trial court properly dismissed defendant's petition without a hearing or funding for an expert because defendant did not set forth sufficient facts to demonstrate substantive grounds for relief. According to the state, Lott does not mandate an evidentiary hearing and expert assistance in every case but merely requires that the defendant have an opportunity to submit evidentiary documentation to the court. Because these arguments are interrelated, we address them together in defendant's second assignment of error.
 {¶ 25} Lott necessarily determined the procedures set forth in R.C. 2953.21 et seq. provided a suitable framework for reviewing Atkins claims: no other alternative for review exists for defendants who were convicted and sentenced to death prior toAtkins. The court also held that because a defendant sentenced prior to Atkins previously could not have raised the claim as a constitutional bar to the death penalty, a petition asserting anAtkins claim would be treated as a first petition for post-conviction relief. Further, although appointment of experts is generally not required in post-conviction matters, the court held that the trial court, in conducting its de novo review of the evidence, should rely on professional evaluations of the defendant's mental status "and consider expert testimony, appointing experts if necessary, in deciding the matter." Lott,
at ¶ 18.
 {¶ 26} R.C. 2953.21(A)(1) requires a post-conviction petitioner to demonstrate a denial or infringement of his rights that renders the conviction void or voidable under the Ohio or United States Constitutions. The petitioner bears the initial burden of demonstrating substantive grounds for relief through the petition and any supporting affidavits, files, and records of the case. A claim for post-conviction relief is subject to dismissal without a hearing if the petitioner fails to submit evidentiary material that sets forth operative facts demonstrating the petitioner may be entitled to relief. R.C.2953.21(C). If the petition, files, and records of the case show the petitioner may be entitled to relief, the court must hold a hearing. R.C. 2953.21(E).
 {¶ 27} Defendant provided the following documents to support his petition: (1) a 1969 psychiatric evaluation report that the Education Therapy Center conducted when defendant was 15 years old, and (2) a 1995 report of an evaluation that forensic psychologist Dr. Smalldon conducted.
 {¶ 28} The 1969 report references "psychologicals" the Juvenile and Domestic Relations Court administered on October 21, 1968 that indicated defendant's full scale IQ was 72, his verbal IQ was 79 and his performance IQ was 71. The report also references psychologicals from Richmond public schools, prior to 1965, that stated defendant had an IQ in the "slow learner" range, meaning between 80 and 89. The report ultimately diagnosed defendant to have "Borderline Mental Retardation Associated with environmental deprivation." (Report, at 3.) According to the report, "[t]his is a boy of limited intelligence who is impulsive, has a poorly developed conscience, has not been supervised and is under the influence of powerful adolescent sexual drives which he has not learned how to control." Id. The report also noted that both parents described defendant as a slow learner, that in 1965 defendant was sent home from school at least six times for banging his head against his desk, and that defendant was a bed wetter. Defendant's mother and father were of limited intelligence and were not interested in any of their children.
 {¶ 29} In 1995, Dr. Smalldon conducted an evaluation of defendant and performed a battery of tests. Dr. Smalldon reported that defendant's full scale IQ was 83, at the cusp of the borderline mentally retarded and low average ranges. Dr. Smalldon's administration of tests produced data "strongly suggestive of at least mild brain impairment." (Report, at 23.) Defendant's "actual achievement levels in three areas of core academic skill — word recognition, spelling, and arithmetic — are even lower than one might have predicted based on his IQ estimates." (Report, at 18.) Dr. Smalldon indicated that once defendant's formal education ceased at around the fourth grade, defendant's acquisition of basic skills ceased as well.
 {¶ 30} Dr. Smalldon observed that an EEG performed when defendant was 11 years old made a non-specific finding suggesting mild brain impairment, and his parents described him as a slow learner. The report indicates defendant, as a child, felt mental health professionals stigmatized and labeled him as mentally retarded. Dr. Smalldon pointed out defendant was a poor performer at school almost from the outset.
 {¶ 31} Further, Dr. Smalldon stated that defendant exhibited pronounced impulsivity, was easily distracted, and engaged in a pattern of "rocking" as a child. Defendant regularly banged his head against walls and other hard surfaces both at home and school, and he continued to wet his bed on a regular basis until he was in his midteens. Dr. Smalldon also noted defendant had longstanding emotional and behavioral problems. Records documenting his behavior over the years revealed that defendant was consistently described as interpersonally isolated, emotionally immature, and impulsive. Dr. Smalldon stated that his review of records indicated defendant has poor social skills, has trouble getting along with his peers, and has low self-esteem. Further, the jobs defendant "has held have typically called for little in the way of specialized skill or training." (Report, at 6.)
 {¶ 32} Relying on those facts, defendant cites to several cases, some involving less documentation than defendant submitted, that granted a hearing and appointed a mental health expert. In Hughbanks, the trial court denied the petitioner's post-conviction Atkins claim without an evidentiary hearing and without allowing discovery. The First District Court of Appeals reversed, finding the evidentiary materials and records of the case sufficient to sustain petitioner's burden of demonstrating substantive grounds for relief. The court held the evidence was sufficient to warrant a hearing and discovery, including the experts "necessary to aid in that discovery and to assist in presenting the claim." Id. at 263.
 {¶ 33} In so concluding, the court pointed out mitigation evidence reflecting a full scale IQ of 82, a lack of personal skills to cope with family, education, employment and finances, and a psychologist's diagnosis of mental retardation that rendered defendant eligible for Social Security benefits. The court of appeals also noted the Ohio Supreme Court's previous conclusion, made in its independent review during defendant's direct appeal, that the record contained "no evidence that Hughbanks [was] mentally retarded." Id., quoting State v.Hughbanks, 99 Ohio St.3d 365, 2003-Ohio-4121; see, also, Statev. Carter, 157 Ohio App.3d 689, 2004-Ohio-3372 (holding that petitioner was entitled to a hearing and expert assistance where petitioner's full scale IQ was 76, the mitigation expert concluded petitioner was "borderline mentally retarded," Social Security records indicated petitioner received benefits due to mental retardation, and a psychologist with expertise in mental retardation opined that strong indications of mental retardation warranted further testing).
 {¶ 34} Similarly, in Bays, the Second District Court of Appeals reversed the trial court's decision denying the petitioner's request for funding to retain expert assistance in connection with the petitioner's Atkins claim. Like the petitioners in the cases cited above, Bays had introduced evidence during the mitigation phase of his trial regarding his low-level mental functioning. Specifically, two experts testified that Bay's IQ was "above 70": one testified Bays was not included in the two percent of the population considered mentally retarded, while the second expert testified Bays was within the "borderline" range of intellectual functioning. Id. at 474.
 {¶ 35} Although the trial court granted a hearing, the trial court overruled the petitioner's motion for funding, stating that "[t]wo experts have previously examined the Defendant, the results of which are available to Defendant and his counsel. * * * The records in this case indicate that not only has Petitioner been examined during the pendency of the case, but that such examination gave every indication of Petitioner being above the threshold established by the courts for mental retardation." Bays, at ¶ 8-9.
 {¶ 36} On appeal, Bays asserted the trial court erred in refusing to provide expert services. Essentially, Bays contended that without expert assistance he could not prove his Atkins
claim. The Second District agreed, concluding "[t]here is a significant difference between expert testimony offered for mitigation purposes and expert testimony offered for Atkins
purposes"; the earlier evidence was not developed to prove or disprove Bay's Atkins claim. Bays, at ¶ 23.
 {¶ 37} The court recognized Lott's rebuttable presumption that Bays is not mentally retarded if his IQ is above 70, but stated "he must be allowed access to the resources that might permit him to rebut this presumption, in view of the fact that he is an indigent defendant with significant, documented cognitive deficits, as shown by his school records and the testimony of [the two experts offered for mitigation purposes]." Bays, at ¶ 24. As the court stated in Lorraine, at ¶ 30 "[a]n indigent, postconviction petitioner cannot be required to show that an expert is needed to prove he is mentally retarded if an expert would indeed be required to make that showing." Id. (holding that the petitioner was entitled to an evidentiary hearing and expert assistance because petitioner's full scale IQ of 73 was not dispositive of his Atkins claim where mitigation evidence demonstrated below average intellectual functioning).
 {¶ 38} Like the petitioners in Hughbanks, Carter, Bays, andLorraine, defendant attached sufficient evidence to his petition, including facts comparable to the noted cases, to demonstrate that he may be entitled to relief. The documentation suggests defendant has below average intellectual functioning that was apparent well before he was 18 years old. Although defendant's lowest IQ score of 73 is above the rebuttable presumption, the noted cases similarly involved IQ's above 70. See, also, Lott, supra (stating that IQ score alone is not determinative of mental retardation).
 {¶ 39} The evidence submitted with defendant's petition further suggests defendant has limitations in adaptive skills, and in particular in social skills and conceptual skills. Dr. Smalldon noted defendant's conceptual achievement levels in language, spelling, and arithmetic were even lower than anticipated based on his IQ scores, including difficulty comprehending simple, common words and lacking self-direction. Dr. Smalldon also pointed out defendant's low self-esteem and generally poor social skills, including poor interpersonal relationships, trouble getting along with peers, and feelings of isolation. Even in the practical skills area, evidence suggests defendant had trouble controlling bodily elimination until he reached his mid-teens.
 {¶ 40} The state's arguments against a finding of limitations in adaptive skills are more suited for a determination of whether defendant is mentally retarded, and that is a question we do not address at this time. Instead, we determine only whether defendant presented enough evidence to warrant an expert witness and a hearing. For the reasons noted, defendant is entitled to an evidentiary hearing pursuant to R.C. 2953.21 and the funding necessary for an expert to aid in the presentation of hisAtkins claim.
 {¶ 41} The state nonetheless presents a series of arguments in opposition to the noted cases. Initially, the state contends the present case is distinguishable from Hughbanks and Carter
because evidence in those cases demonstrated that the petitioners were diagnosed with mental retardation at some point in time. The state is correct insofar as it notes defendant has not been diagnosed to be mentally retarded. The diagnoses in Hughbanks
and Carter, however, were made for purposes of Social Security benefits, not an Atkins claim. Moreover, despite the diagnosis of mental retardation for purposes of receiving Social Security supplemental income, petitioner Carter presented a full scale IQ of 76, and petitioner Hughbanks presented a full scale IQ of 82, both of which are higher than one of the IQ scores presented in defendant's petition.
 {¶ 42} In addition, the petitioners in Bays and Lorraine
did not present a diagnosis of mental retardation to support their Atkins claim. Despite no actual mental retardation diagnosis, the court provided a hearing and the expert assistance suggested in Lott. Indeed, nothing in Lott requires an actual diagnosis of mental retardation prior to obtaining an evidentiary hearing or expert assistance. To the contrary, Lott indicates that if a petitioner presents sufficient evidence of below average intellectual functioning and limitations in adaptive skills prior to age 18, an expert should be provided.
 {¶ 43} The state next attempts to distinguish Bays andLorraine because neither case involved a post-judgment evaluation that rejected mental retardation. Here, the state observes that Dr. Lecavalier conducted a post-Atkins evaluation of defendant. Because the PD dismissed defendant's Atkins
petition subsequent to that completed evaluation, the state claims Dr. Lecavalier concluded defendant was not mentally retarded. The state's contention is unpersuasive.
 {¶ 44} The record contains no evidence regarding the substance of Dr. Lecavalier's evaluation of defendant. As a result, we have no information indicating the tests performed on defendant, the records that were reviewed for purposes of the evaluation, or Dr. Lecavalier's conclusions or diagnosis of defendant. The fact of Dr. Lecavalier's evaluation, without more, is insufficient to deny defendant a hearing and an expert to assist in proving his claim.
 {¶ 45} The state also asserts that a hearing and expert assistance are not necessary in this case because Dr. Smalldon's 1995 evaluation of defendant was extensive and comprehensive. In essence, the state contends that if defendant is mentally retarded, Dr. Smalldon would have so concluded. Instead, the state points out, Dr. Smalldon concluded only that defendant is "borderline mentally retarded." Again, the state's contention is unpersuasive.
 {¶ 46} Dr. Smalldon conducted his evaluation, however comprehensive it may be, seven years prior to Atkins. The record is unclear concerning the standards Dr. Smalldon employed in his evaluation, and, as noted, we cannot assume the correct standards were utilized when no evidence supports that assumption. Dr. Smalldon did not have the benefit of the guidelines set forth in Lott for purposes of an Atkins claim. Though the 1969 and 1995 reports are relevant to defendant's psychological, cognitive and behavioral characteristics, they were not procured and developed as evidence going to the ultimate issue presented by his Atkins claim: whether defendant is so impaired that his execution would constitute cruel and unusual punishment. See Bays, at ¶ 23; Carter, at ¶ 22; Hughbanks,
at ¶ 12; Lorraine, at ¶ 17.
 {¶ 47} Because the reports are neither the product of expert assistance specifically directed toward defendant's attempt to rebut the presumption that he is not mentally retarded nor to prove that his execution would be unconstitutional, their availability does not, in themselves, obviate the need for expert funding in defendant's first attempt to prove his Atkins claim.
 {¶ 48} We do not hold that all who assert a claim pursuant toAtkins and Lott necessarily will warrant a hearing and expert assistance simply by raising the issue. Moreover, we offer no opinion whether defendant is mentally retarded for purposes of his Atkins claim. Because, however, the documentation provided to the trial court in support of defendant's Atkins petition demonstrates that defendant may be entitled to relief, defendant is entitled to an evidentiary hearing and funding for an expert to develop his Atkins claim. Accordingly, defendant's second assignment of error is sustained.
 {¶ 49} Having overruled defendant's third, fourth and fifth assignments of error, but having sustained defendant's first and second assignments of error, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.
Judgment reversed and case remanded.
Klatt, P.J., and Sadler, J., concur.