The STATE of Ohio, Appellee,

v.

HILL, Appellant.

[Cite as *State v. Hill,* 177 Ohio App.3d 171, 2008-Ohio-3509.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 2006–T–0039.

Decided July 11, 2008.

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

Michael J. Benza and Jillian S. Davis, for appellant.

---

DIANE V. GRENDELL, P.J.

{¶ 1} Defendant-appellant, Danny Lee Hill, appeals the judgment of the Trumbull County Court of Common Pleas denying his petition for postconviction relief. For the following reasons, we affirm the decision of the court below.

{¶ 2} On September 10, 1985, 12–year–old Raymond Fife was found brutalized in a field near his home in Warren, Ohio. Raymond died two days later. In September 1985, Hill and an accomplice, Timothy Combs, were indicted for the crime. In 1986, Hill was found guilty, by a three-judge panel in the Trumbull County Court of Common Pleas, of the following charges: aggravated murder with specifications of aggravating circumstances, kidnapping, rape, aggravated arson, and felonious sexual penetration.

{¶ 3} On February 26, 1986, a mitigation hearing was held to determine whether the death penalty would be imposed for Raymond's murder. The three-judge panel "considered the following factors in possible mitigation: (1) The age of the defendant; (2) The low intelligence of the defendant; (3) The poor family environment; (4) The failure of the State or society to prevent this crime; (5) The defendant's impaired judgment; (6) Whether or not he was a leader or follower." The three-judge panel concluded that "the aggravating circumstances in this case outweigh the mitigating factors beyond a reasonable doubt."

{¶ 4} On March 5, 1986, Hill was sentenced to the following: death for aggravated murder; imprisonment for an indeterminate period of ten to 25 years for kidnapping; imprisonment for determinate period of life for rape; imprisonment for an indeterminate period of ten to 25 years for aggravated arson; and imprisonment for a determinate period of life for felonious sexual penetration.

{¶ 5} Hill's convictions and sentence were upheld on appeal by this court. *State v. Hill* (Nov. 27, 1989), 11th Dist. No. 3720, 3745, 1989 WL 142761. In our review of the appropriateness of imposing the death penalty, this court noted: "The record is replete with competent, credible evidence which states that appellant has a diminished mental capacity. He is essentially illiterate, displays poor word and concept recognition and, allegedly, has deficient motor skills. Appellant is characterized as being mildly to moderately retarded. There is some suggestion that appellant's 'mental age' is that of a seven to nine year old boy. Testimony places appellant's I.Q. between 55 and 71, which would cause him to be categorized as mildly to moderately retarded." Id. at *32. This court

affirmed the conclusion that the evidence of low intelligence and impaired judgment were not significant mitigating factors. "Consideration of evidence delineating appellant's mental retardation is more properly applied when evaluating his ability to knowingly, intelligently and voluntarily waive his constitutional rights. There is no evidence presented that requires the conclusion that this crime was committed because a mental defect precluded appellant from making the correct moral or legal choice." Id. at *32.

{¶ 6} Hill appealed his case to the Ohio Supreme Court, which, in accordance with R.C. 2929.05(A), independently reviewed the record to determine that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case. *State v. Hill* (1992), 64 Ohio St.3d 313, 335, 595 N.E.2d 884.

{¶ 7} The Supreme Court acknowledged that Hill's "mental retardation is a possible mitigating factor." Id. The court summarized the testimony of the psychologists who testified during the mitigation phase of Hill's trial:

{¶ 8} Dr. Douglas Darnall, a psychologist, testified that defendant had an I.Q. of 55 and that his intelligence level according to testing fluctuates between mild retarded and borderline intellectual functioning, and that he is of limited intellectual ability. Dr. Darnall did state, however, that defendant was able to intellectually understand right from wrong.

{¶ 9} Dr. Nancy Schmidtgoessling, a clinical psychologist, testified that defendant had a full scale I.Q. of 68, which is in the mild range of mental retardation, and that the defendant's mother was also mildly retarded.

{¶ 10} Dr. Schmidtgoessling also testified that defendant's moral development level was "primitive," a level at which "one do[es] things based on whether you think you'll get caught or whether it feels good. [T]hat's essentially whereabout [*sic*] a 2–year old is."

{¶ 11} Dr. Douglas Crush, another psychologist, testified that defendant had a fullscale I.Q. of 64, and that his upper level cortical functioning indicated very poor efficiency.

{¶ 12} Having reviewed this testimony, the Supreme Court found "a very tenuous relationship between the acts he committed and his level of mental retardation." Id. at 335, 595 N.E.2d 884. "When considering the manner in which the victim was kidnapped and killed; the rape, burning, strangulation and torture the victim endured," the court concluded that "these aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt" and affirmed the sentence of death. Id.

{¶ 13} In 2002, the United States Supreme Court held that the execution of mentally retarded criminals violates the Eighth Amendment's ban on cruel and unusual punishments. *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. In *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, the Ohio Supreme Court addressed the implications of the *Atkins* decision on the execution of capital punishment in Ohio. The court adopted three criteria for establishing mental retardation, based on clinical definitions approved in *Atkins*: "(1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." Id. at ¶ 12. The court further held that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue," and "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Id.

{¶ 14} On January 17, 2003, Hill filed a petition to vacate Danny Hill's death sentence pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, and R.C. 2953.21. Hill asserted that his mental retardation is "a fact of record in his case" and that the state is thereby "barred by the doctrine of collateral estoppel from any attempt to relitigate the proven fact that [Hill] is a person with mental retardation." In the alternative, Hill argued the trial court should take judicial notice of the fact that he is a person with mental retardation and/or hold a hearing on the issue of his mental retardation.

{¶ 15} On April 4, 2003, the trial court ruled that Hill's petition stated "substantive ground for relief sufficient to warrant an evidentiary hearing." The court granted the state's and Hill's requests to retain their own experts in the field of mental retardation. Over Hill's objection, the court determined to retain its own expert to evaluate Hill "pursuant to his *Atkins* claim." The court denied Hill's request to have a jury empanelled to adjudicate his *Atkins* claim.

{¶ 16} The state retained as its expert Dr. J. Gregory Olley, a professor at the University of North Carolina at Chapel Hill and a director of the university's Center for the Study of Development and Learning. Hill retained as his expert Dr. David Hammer, a professor at the Ohio State University and the director of psychology services at the university's Nisonger Center. The court, through the Forensic Center of Northeast Ohio, retained Dr. Nancy Huntsman, of the Court Psychiatric Clinic of Cleveland.

{¶ 17} In April 2004, Drs. Olley, Hammer, and Huntsman evaluated Hill at the Mansfield Correctional Institution for the purposes of preparing for the *Atkins* hearing. At this time, Hill was administered the Wechsler Adult Intelligence Scale ("WAIS–III") IQ test, the Test of Mental Malingering, the Street Survival

Skills Questionnaire, and the Woodcock–Johnson–III. The doctors concurred that Hill was either "faking bad" and/or malingering in the performance of these tests. As a result, the full scale IQ score of 58 obtained on this occasion was deemed unreliable, and no psychometric assessment of Hill's current adaptive functioning was possible. Thus, the doctors were forced to rely on collateral sources in reaching their conclusions, such as Hill's school records containing evaluations of his intellectual functioning, evaluations performed at the time of Hill's sentencing and while Hill was on death row, institutional records from the Southern Ohio Correctional Institution and the Mansfield Correctional Institution, interviews with Hill, corrections officers, and case workers, and prior court records and testimony.

{¶ 18} The evidentiary hearing on Hill's *Atkins* petition was held on October 4 through 8 and 26 through 29, 2004, and on March 23 through 24, 2005. Doctors Olley and Huntsman testified that in their opinion, Hill is not mentally retarded. Doctor Hammer concluded that Hill qualifies for a diagnosis of mild mental retardation.

{¶ 19} In the course of the trial, an issue arose regarding the interpretation of the results of the Vineland Social Maturity Scale test, a test designed to measure adaptive functioning and performed on Hill four times prior to the age of 18. Hill presented the testimony of Sara S. Sparrow, Ph.D., professor emerita of Yale University, to rebut certain opinions expressed by Dr. Olley. In turn, the state called Timothy Hancock, Ph.D., executive director of the Parrish Street Clinic, in Durham, North Carolina, as a surrebuttal witness to Dr. Sparrow.

{¶ 20} The following lay persons also testified at the hearing regarding Hill's functional abilities: corrections officer John Glenn, death row case manager Greg Morrow, death row unit manager Jennifer Sue Risinger, and corrections officer Steven Black.

{¶ 21} On November 30, 2005, Hill filed a petitioner's supplemental authority and renewed double jeopardy motion, in which he asserted that the state is barred by the doctrine of collateral estoppel and the Double Jeopardy Clause from relitigating the issue of his mental retardation.

{¶ 22} On February 15, 2006, the trial court issued its judgment entry denying Hill's petition for postconviction relief in which he claimed to be a person with mental retardation and rejecting his arguments regarding double jeopardy/collateral estoppel.

{¶ 23} On March 15, 2006, Hill filed a timely notice of appeal to this court.

{¶ 24} On August 21, 2006, Hill, acting pro se, filed a motion to withdraw the merit brief filed by counsel and a request that this court would order a competency hearing to determine whether Hill is competent to waive all appeals

and proceedings in this matter. The basis for the motion is that appointed counsel had filed a merit brief in this appeal without properly investigating Hill's " 'Atkins' claims and/or constitutional violations."

{¶ 25} On October 27, 2006, this court issued the following judgment entry: "The trial court is directed to promptly hold an evidentiary hearing to determine Appellant's competency to make decisions regarding his counsel and possible waiver of the right to appeal. Depending upon the outcome of that determination, the trial court shall further determine whether Appellant has actually decided to waive his right to proceed in the appeal; and whether that decision has been made voluntarily, knowingly and intelligently."

{¶ 26} The trial court appointed Thomas Gazley, Ph.D., with the Forensic Psychiatric Center of Northeast Ohio, to evaluate Hill. Dr. Gazley interviewed Hill on two occasions in November 2006. On December 7, 2006, a hearing was held on the competency issue.

{¶ 27} On December 8, 2006, the trial court issued a judgment entry finding that Hill is "competent to make a decision whether or not to pursue an appeal" and has, "in open court," expressed his desire to pursue an appeal from the adverse decision of the trial court on the issue of mental retardation.

{¶ 28} On February 1, 2007, this court overruled Hill's motion to withdraw the merit brief filed by counsel, and request that this court would order a competency hearing as moot.

{¶ 29} On appeal, Hill raises the following assignments of error:

{¶ 30} "[1.] The Trial Court Erred in failing to Apply Double Jeopardy and *Res Judicata* Doctrines to Prevent Renewed Litigation of Mr. Hill's Status as a Person with Mental Retardation."

{¶ 31} "[2.] The Trial Court Erred in Denying Mr. Hill a Jury Determination of his Mental Retardation Status and Not Imposing the Burden of Proof on the State of Ohio to Prove the Absence of Mental Retardation Beyond a Reasonable Doubt."

{¶ 32} "[3.] The Trial Court Erred in Finding that Mr. Hill Was Not a Person with Mental Retardation."

{¶ 33} "[4.] The Trial Court Erred in Determining Mr. Hill was Competent to Proceed with this Appeal."

{¶ 34} Under the first assignment of error, Hill argues that relitigation of the issue of his mental retardation is barred by the Double Jeopardy Clause of the Fifth Amendment and by the doctrine of res judicata/collateral estoppel. Hill cites several cases in which the fact of his mental retardation has allegedly been judicially determined. *Hill*, 11th Dist. Nos. 3720, 3745, 1989 WL 142761 ("[a]p-

pellant, in the case at bar, admittedly suffers from some mental retardation"); *Hill*, 64 Ohio St.3d at 335, 595 N.E.2d 884 ("we find that defendant's mental retardation is a possible mitigating factor").

{¶ 35} Collateral estoppel is one aspect of the doctrine of res judicata and precludes the relitigation in a second action of an issue or issues that have been "actually and necessarily litigated and determined in a prior action." *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 195, 2 OBR 732, 443 N.E.2d 978, citing *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 112, 49 O.O.2d 435, 254 N.E.2d 10; *Grava v. Parkman Twp.* (1995), 73 Ohio St.3d 379, 381, 653 N.E.2d 226. Cf. *Ashe v. Swenson* (1970), 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit").

{¶ 36} "Collateral estoppel applies when the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action." *Thompson v. Wing* (1994), 70 Ohio St.3d 176, 183, 637 N.E.2d 917, citing *Whitehead*, 20 Ohio St.2d 108, 49 O.O.2d 435, 254 N.E.2d 10, at paragraph two of the syllabus.

{¶ 37} Application of the doctrine of res judicata/collateral estoppel to a particular issue is a question of law. *State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 174 Ohio App.3d 135, 2007-Ohio-6594, 881 N.E.2d 294, at ¶ 41. Accordingly, it is reviewed under a de novo standard of review, i.e. without deference to the lower court's decision. *Rossow v. Ravenna* (Mar. 29, 2002), 11th Dist. No. 2001–P–0036, 2002 WL 480061.

{¶ 38} The lower court, in considering this issue, began with the premise that *Atkins* and *Lott* created a new standard and a new procedure for determining whether a capital offender's mental retardation barred his execution. The court observed that Hill's "earlier claims of mental retardation (during the pre-trial and trial phases of the underlying case) related to voluntariness of statements, waiver of counsel at an investigatory stage, and waiver of *Miranda* rights." With respect to the Eighth Amendment, however, the issue of mental retardation has "constitutional dimensions and constitutional imperatives" distinguish it from the myriad contexts in which it has previously been considered. Thus, mental retardation "has been scientifically, psychologically, and artfully (in the legal sense) defined in fresh light." Cf. *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 17 ("*Atkins* established the new standard for mental retardation").

On this basis, the lower court concluded that, for Hill, the issue of mental retardation is being litigated for the first time.

■ {¶ 39} Our analysis focuses on the first element of collateral estoppel: whether the issue of Hill's mental retardation "was actually and directly litigated in the prior action." We hold that the issue of Hill's mental retardation was not "actually and directly litigated" at his sentencing hearing because the finding that he was mentally retarded was not essential to the imposition of the death penalty in the same way that it is essential in the *Atkins/Lott* context.

■ {¶ 40} Hill maintains that "the issue of mental retardation was essential to his argument against the imposition of the death penalty." Hill relies on the Sixth Circuit's decision in *Bies v. Bagley* (C.A.6, 2008), 519 F.3d 324, decided during the pendency of this appeal.[1]

{¶ 41} In *Bies,* the Sixth Circuit concluded the determination that an offender is mentally retarded during the penalty phase is a "necessary" finding because, under Ohio law, "a sentencing court may not impose the death penalty unless that court has first considered any mitigating factors weighing against a death sentence, * * * and found those mitigating factors proven by a preponderance of the evidence." Id. at 336; R.C. 2929.04(B). "[B]ecause a sentencing court's inquiry is open-ended, determining which mitigating factors are actually present in a case is a necessary first step to determining whether those factors outweigh the aggravating circumstances." *Bies,* 519 F.3d at 337.

{¶ 42} We disagree. The fact that the sentencing court in a capital case must weigh potential mitigating factors against the aggravating circumstances does not mean that a finding that an offender is, or is not, mentally retarded constitutes a necessary finding for the imposition of the death penalty. Rather, the contrary is true under Ohio law. Ohio's death penalty statutes do not require that any express finding be made regarding an offender's mental retardation. Moreover, at the time Hill was sentenced, an offender's retardation was not a bar to the imposition of the death penalty.

{¶ 43} The "Criteria for Imposing Death or Imprisonment for a Capital Offense" statute provides that the trier of fact in the penalty phase "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

---

1. We note that this court is "not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court," although such decisions are accorded "some persuasive weight." *State v. Burnett* (2001), 93 Ohio St.3d 419, 424, 755 N.E.2d 857.

{¶ 44} "Whether the victim of the offense induced or facilitated it;

{¶ 45} "Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

{¶ 46} "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

{¶ 47} "The youth of the offender;

{¶ 48} "The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

{¶ 49} "If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

{¶ 50} "Any other factors that are relevant to the issue of whether the offender should be sentenced to death." R.C. 2929.04(B).

{¶ 51} Two observations should be made with respect to the statute. The first is that the statute does not require any express finding regarding an offender's mental retardation. In pre-*Atkins* capital cases, an offender's mental retardation was typically considered as a factor, under subsection (7), potentially affecting the offender's moral culpability for his or her actions. See, e.g., *State v. Bies* (1996), 74 Ohio St.3d 320, 328, 658 N.E.2d 754; *State v. Gumm* (1995), 73 Ohio St.3d 413, 432–433, 653 N.E.2d 253; *Hill*, 64 Ohio St.3d at 335, 595 N.E.2d 884; cf. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 267 (an offender's "limited intellectual abilities are entitled to significant weight in mitigation under the catchall provision of R.C. 2929.04(B)(7)"). Thus, the three-judge panel that sentenced Hill to death did not expressly find or even acknowledge Hill's retardation. Rather, the sentencing entry noted that Hill's "low intelligence," "impaired judgment," and "whether or not he was a leader or a follower" were considered as mitigating factors. An express finding that Hill was mentally retarded was neither required nor necessary to sentence him to death under Ohio law at that time.

{¶ 52} The second observation is that no particular mitigating factor precludes the imposition of the death penalty. The statute is "open-ended" in that the trier of fact must consider any relevant factor. Simply because all relevant factors must be considered does not mean that all relevant factors are material to the imposition of the death penalty. The determination that particular mitigating factors exist is necessary only in the sense that these factors must be weighed against the aggravating circumstances, which, in contrast, must be found to exist beyond a reasonable doubt for the death penalty to be imposed.

{¶ 53} Beyond consideration of Ohio's death-penalty statute, under the federal law in effect at the time of Hill's sentencing, the determination that an offender was mentally retarded was not necessary to the outcome of a capital sentencing hearing. In other words, at the time of his original sentencing, Hill was eligible for the imposition of the death penalty regardless of whether he was found to be mentally retarded. As stated by the United States Supreme Court, "mental retardation is a factor that may well lessen a defendant's culpability for a capital offense," but it could not be said "that the Eighth Amendment precludes the execution of any mentally retarded person * * * convicted of a capital offense simply by virtue of his or her mental retardation alone." *Penry v. Lynaugh* (1989), 492 U.S. 302, 340, 109 S.Ct. 2934, 106 L.Ed.2d 256.

{¶ 54} Because mental retardation did not preclude the imposition of the death penalty at the time of Hill's sentencing, the state did not have "a full and fair opportunity to litigate" the issue during the penalty phase of Hill's trial, as is necessary before collateral estoppel may be applied. *Bies,* 519 F.3d at 338, citing *N.A.A.C.P. Detroit Branch v. Detroit Police Officers Assn.* (C.A.6, 1987), 821 F.2d 328, 330; *Goodson,* 2 Ohio St.3d at 201, 2 OBR 732, 443 N.E.2d 978 ("an absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action").

{¶ 55} "Collaterally estopping a party from relitigating an issue previously decided against it violates due process where it could not be foreseen that the issue would subsequently be utilized collaterally, and where the party had little knowledge or incentive to litigate fully and vigorously in the first action due to the procedural and/or factual circumstances presented therein." *Goodson,* 2 Ohio St.3d at 201, 2 OBR 732, 443 N.E.2d 978; *State ex rel. Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 15 O.O.3d 53, 399 N.E.2d 81, at paragraph two of the syllabus ("[w]here there has been a change in the facts since a decision was rendered in an action, which either raises a new material issue or which would have been relevant to the resolution of a material issue involved in the earlier action, neither the doctrine of *res judicata* nor the doctrine of collateral estoppel will bar litigation of that issue in a later action").

{¶ 56} In the present case, the state did not have the knowledge or incentive to vigorously litigate the issue of Hill's mental retardation, because that issue was only tangentially relevant to whether the death penalty was appropriate. There was no reason for the state to contest the evidence of retardation introduced at the mitigation hearing because that evidence did not link Hill's alleged retardation with his culpability for the murder of Raymond Fife. Without this connection, the fact that Hill might be mentally retarded was not particularly relevant to whether Hill could be executed.

{¶ 57} This conclusion is well supported by the remarks of this court and of the Ohio Supreme Court in the direct appeals of Hill's case. This court observed that Hill's own expert witness, Dr. Darnall, "testified that [Hill] possessed an intellectual understanding of right and wrong and further stated that [Hill's] crimes cannot be attributed to the fact that he was mentally retarded." *Hill*, 11th Dist. Nos. 3720, 3745, 1989 WL 142761. Thus, "[c]onsideration of evidence delineating appellant's mental retardation is more properly applied when evaluating his ability to knowingly, intelligently and voluntarily waive his constitutional rights." Id. at *32. Likewise, the Ohio Supreme Court dismissed the evidence of Hill's retardation because it found, "[u]pon a careful review of the expert testimony proffered with respect to defendant's mental retardation, * * * a very tenuous relationship between the acts he committed and his level of mental retardation. As several of the experts pointed out, defendant did not suffer from any psychosis, and he knew right from wrong." *Hill*, 64 Ohio St.3d at 335, 595 N.E.2d 884.

{¶ 58} In sum, the United States Supreme Court's decision in *Atkins* changed the law with respect to capital punishment, making an offender's mental retardation a material fact as to whether the death penalty could be imposed. *State v. Lorraine*, 11th Dist. No. 2003–T–0159, 2005-Ohio-2529, 2005 WL 1208119, at ¶ 27, citing *State v. Bays*, 159 Ohio App.3d 469, 2005-Ohio-47, 824 N.E.2d 167, at ¶ 23 ("[t]here is a significant difference between expert testimony offered for mitigation purposes and expert testimony offered for *Atkins* purposes"). Previously, an offender's retardation was merely a consideration relative to the degree of moral culpability that may be imputed to an offender for his or her actions. Post-*Atkins*, the fact of an offender's retardation constitutes an absolute bar to the imposition of the death penalty.

{¶ 59} Additionally, there has been no prior judicial determination that Hill is retarded in accordance with the standards and procedures established by *Lott*. *Hill v. Anderson* (C.A.6, 2002), 300 F.3d 679. In a prior habeas petition regarding Hill's *Atkins* claim in the Sixth Circuit, the court ordered the petition to be dismissed and Hill's case remanded for consideration of his *Atkins* claims in state court. The court explained that "the state of Ohio has not formally conceded that [Hill] is retarded," although several Ohio courts have reached this conclusion, and there is testimony to support it. Id. at 682. "Hill's retardation claim has not been exhausted or conceded. Ohio should have the opportunity to develop its own procedures for determining whether a particular claimant is retarded and ineligible for death." Id.

{¶ 60} As noted above, the three-judge panel did not make any express finding regarding Hill's retardation, but merely noted that his "low intelligence" and "impaired judgment" were considered as mitigating factors. The statements of

subsequent reviewing courts regarding Hill's retardation were made without reference to any particular standard or definition of retardation. Thus, Hill's case is distinguishable from *Bies,* wherein the Sixth Circuit noted that "the state supreme court applied the same clinical definition of mental retardation in its determination that [Bies] is mentally retarded as it did in deciding *Lott.*" 519 F.3d at 334.

{¶ 61} For the foregoing reasons, the question of whether Hill is mentally retarded was not necessary for or particularly relevant to Hill's sentencing and, therefore, not "actually and directly litigated." Similarly, under the trial court's analysis, *Atkins* and *Lott* established a new standard for determining what constitutes mental retardation within the context of the Eighth Amendment. Thus, under either analysis, collateral estoppel does not bar the relitigation of this issue. Hill's first assignment of error is without merit.

{¶ 62} Under the second assignment of error, Hill asserts that the burden of proving that he is not mentally retarded is on the state. Hill further argues the state must meet its burden by proving that he is not retarded beyond a reasonable doubt and that he is entitled to have this determination made by a jury of his peers.

{¶ 63} Hill relies upon a line of United States Supreme Court cases beginning with *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, and which stand for the proposition that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490, 120 S.Ct. 2348, 147 L.Ed.2d 435. In *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, the United States Supreme Court applied its holding in *Apprendi* capital sentencing statutes, such as Ohio's, which require the finding of certain aggravating factors before the death penalty may be imposed. In *Ring,* the Supreme Court held that the existence of such aggravating factors must be determined by a jury and proven beyond a reasonable doubt. Id. at 602, 122 S.Ct. 2428, 153 L.Ed.2d 556.

{¶ 64} When the United States Supreme Court ruled that the Eighth Amendment forbade the execution of the mentally retarded, it left to the individual states the task of developing the appropriate procedures for enforcing the prohibition. *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242, 153 L.Ed.2d 335; *Hill,* 300 F.3d at 682 ("Ohio should have the opportunity to develop its own procedures for determining whether a particular claimant is retarded and ineligible for death").

{¶ 65} In *Lott,* the Ohio Supreme Court held that "[t]he procedures for postconviction relief outlined in R.C. 2953.21 et seq. provide a suitable statutory framework for reviewing" *Atkins* claims raised by offenders sentenced to death

before *Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 13. The Ohio Supreme Court further held that "the trial court," authorized by R.C. 2953.21(A)(1)(a) to determine the merits of postconviction relief petitions, "shall decide whether the petitioner is mentally retarded by using the preponderance-of-the-evidence standard" and that the petitioner bears the burden of establishing that he or she is mentally retarded. Id. at ¶ 17 and 21. The Ohio Supreme Court expressly stated that "these matters should be decided by the court and do not represent a jury question" and that "placing this burden on a criminal defendant does not violate due process." Id. at ¶ 18 and 22. The court relied upon decisions of the United States Supreme Court that sanity and competence may be presumed, and the offender bears the burden of rebutting the presumption. Id. at ¶ 22, citing *Medina v. California* (1992), 505 U.S. 437, 445–446, 112 S.Ct. 2572, 120 L.Ed.2d 353.

{¶ 66} Hill responds that the Ohio Supreme Court's decision in *Lott* does not override "the clear mandate" the United States Supreme Court's decisions in *Apprendi* and *Ring.*

{¶ 67} Initially, we note that this court is bound to follow the precedent established by *Lott* on the issues of procedure and burden of proof for addressing postconviction claims of mental retardation. *Lorraine,* 2005-Ohio-2529, 2005 WL 1208119, at ¶ 57; *State v. Waddy,* 10th Dist. No. 05AP–866, 2006-Ohio-2828, 2006 WL 1530117, at ¶ 16.

{¶ 68} Even considering the substance of Hill's assignment of error, we reject the argument that the *Apprendi/Ring* line of cases requires the issue of an offender's mental retardation to be decided by a jury under a reasonable-doubt standard. These cases apply to factors *enhancing* an offender's punishment beyond what is authorized by statute. "[T]he absence of mental retardation," however, is not "the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt." *In re Johnson* (C.A.5, 2003), 334 F.3d 403, 405. The determination that an offender is not mentally retarded "simply mean[s] that there [i]s nothing to prevent the court from imposing the maximum penalty of death." *State v. Were,* 2005-Ohio-376, 2005 WL 267671, at ¶ 59. "The issue of retardation can affect a sentence only by mitigating it. It can never enhance it." Id. See also *Walker v. True* (C.A.4, 2005), 399 F.3d 315, 326 ("'an *increase*' in a defendant's sentence is not predicated on the outcome of the mental retardation determination; only a decrease." Emphasis sic.); *State v. Laney* (2006), 367 S.C. 639, 627 S.E.2d 726, 731 ("[t]he fact a defendant is not mentally retarded is not an aggravating circumstance that increases a defendant's punishment; rather, the issue is one of eligibility for the sentence imposed by the jury").

{¶ 69} The second assignment of error is without merit.

{¶ 70} Under the third assignment of error, Hill argues the trial court erred in its determination that he is not a person with mental retardation.

{¶ 71} Ohio's definition of mental retardation for purposes of the Eighth Amendment is based on the clinical definitions of mental retardation promulgated by the American Association on Mental Retardation and the American Psychiatric Association and cited in *Atkins*. *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 5. "These definitions require (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12.

{¶ 72} The petitioner raising an *Atkins* claim "bears the burden of establishing that he is mentally retarded by a preponderance of the evidence." Id. at ¶ 21. "In considering an *Atkins* claim, the trial court shall conduct its own de novo review of the evidence in determining whether the defendant is mentally retarded. The trial court should rely on professional evaluations of [the petitioner's] mental status, and consider expert testimony, appointing experts if necessary, in deciding this matter." Id. at ¶ 18. Accord, *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 44–48.

{¶ 73} "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, at ¶ 58.

{¶ 74} With respect to the first criterion, significantly subaverage intellectual functioning is clinically defined as an IQ below 70.[2]

{¶ 75} Hill's IQ was measured nine times between 1973, when he was six years old, and 2000, when he was 33 years old. The scores range from 48 to 71, with the mean being 61.12. In April 2004, Hill scored a 58 on the Wechsler Adult Intelligence Scale. Drs. Hammer, Olley, and Huntsman all agreed that this result was unreliable due to Hill's intentionally trying to obtain a low score.

---

2. More precisely, significantly subaverage intellectual functioning is defined as two standard deviations below the mean for the general population, i.e. an adjusted score of 100 on a standardized test. A single deviation is considered 15 points. Two deviations means a score of 70 or lower. It should also be noted that an IQ score below 70 is not determinative of a diagnosis of mental retardation. Cf. *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12 (holding "that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70").

{¶ 76} The trial court found, by a preponderance of the evidence, that Hill satisfied the first criterion, a conclusion supported by the opinions of Drs. Hammer and Olley. Hill does not challenge the court's finding that he demonstrates significantly subaverage intellectual functioning.

{¶ 77} The second criterion under *Lott* for mental retardation requires the offender to demonstrate significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction.[3] Like intellectual functioning, a person's adaptive skills are subject to standardized measurement, properly known as psychometric analysis.

{¶ 78} In the present case, Drs. Hammer, Olley, and Huntsman attempted to administer various adaptive behavior tests, including the Street Survival Skills Questionnaire ("SSSQ"), the Woodcock Johnson Tests of Achievement, and the Adaptive Behavior Assessment System ("ABAS–II"). No reliable results could be obtained, again on account of Hill's lack of effort. In several instances, Hill denied being able to perform certain skills that it could be determined from independent observation or collateral information sources that he was able to perform.

{¶ 79} On four occasions, between 1980 and 1984, the Vineland Social Maturity Scale ("Vineland I"), a measure of adaptive behavior, was administered to Hill. Vineland I yields two types of scores. The first is a "social age" or "age-equivalent" score. The second is a "social quotient" or SQ, similar to an IQ in that the score is scaled according to an average score of 100 for the general population. An SQ score of 70, representing two standard deviations below the mean, is necessary for a diagnosis of mental retardation. Only three social age scores are recorded from the results of the Vineland I tests. When Hill was 13 years old, it was reported that his social age was 14. When Hill was 15 and 17 years old, his reported social age was 12. In only one instance was an SQ score calculated. When Hill was 17, Dr. Darnall determined his SQ to be 82.9, which would place Hill in the "borderline" category of mental development, but would not support a diagnosis of mental retardation. Dr. Darnall testified at the mitigation hearing that there was room for "potential bias" in the results of the Vineland I SQ score, however, because the source of the information was Hill's mother, and she might have overstated Hill's abilities.

---

**3.** The American Psychiatric Association's definition of mental retardation identified the following categories of adaptive skills: communication; self-care; home living; social/interpersonal skills; use of community resources; self-direction; functional academic skills; work; leisure; health; and safety. In 2002, the American Association on Mental Retardation distilled these categories into three broad groups of adaptive skills: conceptual adaptive skills; social adaptive skills; and practical adaptive skills. The Association on Mental Retardation's definition requires that a significant deficit in only one of these groups be demonstrated.

{¶ 80} At the evidentiary hearing, Dr. Olley calculated approximate SQ scores for Hill based on the reported social age scores and obtained results that placed Hill in the borderline range of social/adaptive development.

{¶ 81} In rebuttal, Hill presented the testimony of Dr. Sparrow, who helped to revise the Vineland I test in 1984, renaming it the Vineland Adaptive Behavior Scales ("Vineland II"). Dr. Sparrow testified that at the time the Vineland II test was being developed, a "linkage study" was conducted by administering both Vineland tests to a sample population of 389 persons to determine what correlation existed between the tests. Based on the study's results, Dr. Sparrow developed a method of predicting what Vineland II scores would be obtained based on Vineland I scores. In this way, she was able to recalculate Hill's Vineland I scores to reflect what he would have obtained under the Vineland II test. Hill's recalculated Vineland scores placed him in the mentally retarded range of scores with respect to adaptive functioning.

{¶ 82} In response to Dr. Sparrow's testimony, the state presented Dr. Hancock as a surrebuttal witness. Dr. Hancock opined that, based on the degree of correlation between the two Vineland tests testified to by Dr. Sparrow, her recalculation of Hill's adaptive skills was only 27 percent reliable.[4] Thus, Dr. Hancock concluded that Hill's recalculated Vineland scores were not scientifically reliable. Based on Dr. Hancock's testimony, the state objected to the admission of Dr. Sparrow's testimony.

{¶ 83} The Ohio Rules of Evidence provide that a witness may testify as an expert when "[t]he witness' testimony is based on reliable scientific, technical, or other specialized information" and "[t]he particular procedure, test, or experiment was conducted in a way that will yield an accurate result." Evid.R. 702(C)(3). "In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 593–594, 113 S.Ct. 2786, 125 L.Ed.2d 469. The "inquiry focuses on whether the principles and methods * * * employed to reach [the] opinion are reliable, not whether [the] conclusions are correct." Id.

---

4. Specifically, Dr. Sparrow testified that the correlation coefficient between Vineland I and II used in the linkage study was .55. According to Dr. Hancock, a minimum coefficient of .866 was necessary to provide 50% certainty that the correct score on Vineland II would be predicted from Vineland I scores.

{¶ 84} "Decisions regarding the admissibility of evidence are within the broad discretion of the trial court." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, at ¶ 20; *Kumho Tire Co. v. Carmichael* (1999), 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 ("a court of appeals is to apply an abuse-of-discretion standard when it 'reviews a trial court's decision to admit or exclude expert testimony' "). "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Beard*, at ¶ 20.

{¶ 85} In the present case, the trial court "concluded that the rate of error of Dr. Sparrow's conclusions on the limited issue of re-casting [Hill's] old scores in a fresh light is so high as to render her testimony inadmissible under the Daubert principle." The trial court explained that it was rejecting Dr. Sparrow's testimony, not because she lacked the proper qualifications or because her opinions lacked general acceptance, but because Dr. Hancock testified the accuracy of her linkage study between the tests fell below 50 percent mathematical probability, and this conclusion was not disputed. The trial court's conclusion regarding Dr. Sparrow's testimony does not constitute an abuse of discretion.

{¶ 86} Alternatively, the trial court stated that it would reject Dr. Sparrow's testimony in favor of the more credible testimony of the other experts who concluded that Hill's adaptive capabilities are greater than those of a person with mental retardation. The trial court noted that Drs. Hammer, Olley, and Huntsman all testified that the Vineland tests were not the most accurate measurement of adaptive behavior available and that other tests are preferable, such as the Scales of Independent Behavior, Revised ("SIB–R"). Cf. *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 49–51.

{¶ 87} Apart from the problematic standardized measurements of Hill's adaptive skills, the trial court and the expert witnesses had to rely on collateral, largely anecdotal evidence to determine the level of Hill's adaptive functioning. The trial court acknowledged that such evidence constituted a "thin reed" on which to make conclusions about Hill's diagnosis, but also recognized that this situation was the result of Hill's failure to cooperate with the experts retained to evaluate him.[5] This court further emphasizes that the burden was on Hill to demonstrate that he is mentally retarded, not on the state to prove that he is not mentally retarded.

{¶ 88} The anecdotal evidence before the trial court consisted of the following:

---

5. Hill's own expert, Dr. Hammer, testified that the results of Hill's performance on the Test of Memory Malingering ("TOMM") "casts doubt on all the testing information collected from Mr. Hill during the evaluation process."

{¶ 89} *Public School Records.* Hill's public school records amply demonstrate a history of academic underachievement and behavioral problems. Hill is often described as a lazy, manipulative, and sometimes violent youth. Although there are references to Hill's being easily led or influenced by others, the trial court noted that much of Hill's serious misconduct, including two rapes committed prior to Fife's murder, occurred when he was acting alone. Hill knew how to write and was described by at least one of his special education teachers as "a bright, perceptive boy with high reasoning ability."

{¶ 90} *Hill's Trial for the Murder of Raymond Fife.* The trial court observed that the record of Hill's murder trial provided evidence of Hill's ability concerning self-direction and self-preservation. In particular, the court noted Hill's initiative in coming to the police in order to misdirect the focus of the investigation by implicating others and Hill's ability to adapt his alibi to changing circumstances in the course of police interrogation. This last point was also noted by Dr. Olley in his hearing testimony: Hill "stood his ground during that interrogation very, very strongly. * * * He not only modified his story a little bit when he was faced with evidence that couldn't possibly have avoided. * * * That to me is a kind of thinking and planning and integrating complex information that is a higher level than I have seen people with mental retardation able to do."

{¶ 91} *Death Row Records.* At the time of the evidentiary hearing, Hill had been incarcerated on death row for 20 years. From this period of time, the trial court considered audiotaped interviews of Hill by Warren's Tribune Chronicle reporter Andrew Gray in the year 2000. These interviews were arranged on Hill's initiative in order to generate publicity for his case. The trial court found Hill's performance on these tapes demonstrated a high level of functional ability with respect to Hill's use of language and vocabulary, understanding of legal processes, ability to read and write, and ability to reason independently.

{¶ 92} The trial court considered the evidence of the various prison officials who testified at the evidentiary hearing. These witnesses consistently testified that Hill was an "average" prisoner with respect to his abilities in comparison with other death row inmates. They testified that Hill interacted with the other inmates, played games, maintained a prison job, kept a record of the money in his commissary account, and obeyed prison rules. Prison officials offered further testimony in their interviews with the expert psychologists. One official opined that Hill began to behave differently after *Atkins* was decided, and he believed that Hill was "playing a game" to make others think he is retarded. Another official reported that Hill's self-care was "poor but not terrible" and that Hill had to be reminded sometimes about his hygiene.

{¶ 93} *Hill's Appearances in Court.* The trial court stated that it had "many opportunities" to observe Hill over an extended period of time and, as a lay observer, did not perceive anything about Hill's conduct or demeanor suggesting that he suffers from mental retardation.

{¶ 94} Finally, the trial court relied on the expert opinions of Drs. Olley and Huntsman that, with reasonable psychological certainty, Hill's adaptive skill deficiencies do not meet the second criterion for mental retardation set forth in *Lott.* Both doctors relied, in part, on the same anecdotal evidence considered by the trial court. The doctors also conducted interviews with Hill and particularly noted Hill's memory of events surrounding Fife's murder 20 years before and his ability to recount the narrative of the events and the complex legal history of his case since that time.

{¶ 95} It is important to note that the trial court's use of anecdotal evidence in the present case is distinguishable from the use of such evidence in *White,* 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905. In *White,* the Ohio Supreme Court reversed a trial court's finding that an *Atkins* petitioner is not mentally retarded where the trial court had relied on anecdotal evidence, such as the fact that the petitioner had a driver's license and could play video games, to support its finding that the petitioner did not demonstrate significant deficits in adaptive skills.

{¶ 96} In the present case and in *White,* the trial court relied upon its own perceptions and other lay testimony that the petitioner appeared to function normally. The Supreme Court held that this reliance constituted an abuse of discretion in light of expert testimony that "retarded individuals *'may look relatively normal in some areas* and have * * * significant limitations in other areas.'" (Emphasis sic.) Id. at ¶ 69.

{¶ 97} The difference between the two cases lies in the fact that in the present case, two of the expert psychologists considered the same anecdotal evidence as the trial court and concluded that Hill was not mentally retarded. The trial court's conclusions were consistent with and supported by the expert opinion testimony. In *White,* the two psychologists who examined the petitioner concluded that there were significant deficiencies in two or more areas of adaptive functioning. Id. at ¶ 21. Thus, the trial court in *White* had substituted its judgment for that of the qualified experts. "While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of law witnesses or of the court's own expectations of how a mentally retarded person would behave. Doing so takes an arbitrary, unreasonable attitude to the evidence before the court and [results] in an abuse of discretion." Id. at ¶ 74.

{¶ 98} Another difference is that in *White,* the experts were able to administer the SIB–R to the petitioner and obtain a psychometrically reliable measurement of his adaptive functioning. Id. at ¶ 14–20. In the present case, the only qualitative measurement of Hill's adaptive functioning, the Vineland I test administered when Hill was 17, indicated that Hill functioned at a level above that of the mentally retarded. Apart from this test, the trial court in the present case had no choice but to rely on anecdotal evidence and/or Drs. Olley and Sparrow's doubtful extrapolations of Hill's adaptive ability.

{¶ 99} In light of the foregoing, there is abundant competent and credible evidence to support the trial court's conclusion that Hill does not meet the second criterion for mental retardation.

{¶ 100} With respect to the third criterion, the trial court found that Hill had failed to demonstrate the onset of mental retardation before the age of 18. The trial court's conclusion mirrors its findings under the first two criteria: Hill demonstrated, by a preponderance of the evidence, significantly subaverage intellectual functioning prior to the age of 18, but failed to demonstrate significant limitations in two or more adaptive skills. The evidence supporting the trial court's conclusions is discussed above.

{¶ 101} The third assignment of error is without merit.

{¶ 102} In the fourth and final assignment of error, Hill argues that he was not properly evaluated to determine his competency to proceed with this appeal. Hill asserts that Dr. Gazley did not perform any psychological testing in his evaluation and that the trial court failed to provide Hill with the resources to conduct an independent competency evaluation.

{¶ 103} "There is no requirement that [an offender] be competent in order for his appeal to proceed * * * in the court of appeals." *State v. Brooks* (2001), 92 Ohio St.3d 537, 539, 751 N.E.2d 1040.

{¶ 104} After the filing of Hill's appeal, however, this court remanded this case with orders for the trial court to determine his competency "to make decisions regarding his counsel and possible waiver of the right to appeal." Cf. *State v. Jordan,* 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, at ¶ 27 (discussing the standard of competence necessary to waive counsel); *State v. Berry* (1997), 80 Ohio St.3d 371, 375–376, 686 N.E.2d 1097 (discussing the standard of competence necessary to waive collateral proceedings in a capital case).

{¶ 105} The trial court appointed Dr. Gazley through the Forensic Psychiatric Center of Northeast Ohio, who interviewed Hill on two occasions. Dr. Gazley also reviewed a court-ordered psychological evaluation of Hill performed by Dr. Huntsman from June 2004. Dr. Gazley concluded, with reasonable psychological certainty, that Hill's "current statements regarding the appeal process, as well as

his legal representation, are indicative of adequate mental capacity and a knowing, intelligent, and voluntary reasoning ability, having chosen means which relate logically to his stated end." The trial court conducted a competency hearing at which Dr. Gazley testified and found Hill competent to proceed with his appeal.

{¶ 106} Hill cites no authority for the proposition that Dr. Gazley's evaluation of his competency was inadequate or that he is entitled to an independent evaluation. On the contrary, it has been held that "[a] defendant in a criminal case has no absolute right to an independent psychiatric evaluation" to determine competency. *State v. Marshall* (1984), 15 Ohio App.3d 105, 15 OBR 195, 472 N.E.2d 1139, at paragraph two of the syllabus; accord *State v. Perry* (June 14, 2001), 5th Dist. No. 00–CA–83, 2001 WL 698144. Moreover, "a psychiatrist's written report and corroborative testimony that the defendant was competent to stand trial is sufficient evidence to support the trial court's finding of competency." *State v. Neely,* 12 Dist. No. CA2002–02–002, 2002-Ohio-7146, 2002 WL 31859454, at ¶ 13.

{¶ 107} The fourth assignment of error is without merit.

{¶ 108} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas denying Hill's petition for postconviction relief on the grounds that he is a person with mental retardation is affirmed. Costs to be taxed against appellant.

Judgment accordingly.

TRAPP, J., concurs.

O'TOOLE, J., dissents.

COLLEEN MARY O'TOOLE, J., dissenting.

{¶ 109} I respectfully dissent.

{¶ 110} With respect to appellant's third assignment of error, the majority contends that the trial court did not err by finding that appellant was not a person with mental retardation. I disagree.

{¶ 111} In *Atkins v. Virginia* (2002), 536 U.S. 304, 308, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3, the United States Supreme Court quoted the definitions of mental retardation promulgated by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA").

{¶ 112} The AAMR defines mental retardation as " 'substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living,

social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' " Id., quoting Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th Ed. 1992).

{¶ 113} The APA's definition is similar: " 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning * * * that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety * * *. The onset must occur before age 18 years * * *. "Mild" mental retardation is typically used to describe people with an IQ level of 50 to 55 to approximately 70.' " Id., quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th Ed. 2000) 42–43.

{¶ 114} In *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 12, the Supreme Court of Ohio held: "Clinical definitions of mental retardation, cited with approval in *Atkins,* provide a standard for evaluating an individual's claim of mental retardation. * * * [Again,] [t]hese definitions require (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18."

{¶ 115} The following chart represents a summary of appellant's IQ scores and psychological evaluations up to April 2004, all of which fall in the mildly mentally retarded range:

{¶ 116}

| CHRONOLOGICAL AGE | FULL SCALE IQ |
| --- | --- |
| 6 years and 2 months | 70 |
| 8 years and 8 months | 62 |
| 13 years and 4 months | 48 |
| 13 years and 5 months | 49 |
| 15 years and 3 months | 63 |
| 17 years | 55 |
| 18 years | 68 |
| 18 years | 64 |
| 33 years | 71 |

{¶ 117} Appellant's date of birth is January 6, 1967. Appellant entered kindergarten in the Warren city schools and was referred by his teacher, as she had questions and concerns "regarding his present level of intellectual functioning." As a result of his first evaluation on March 20, 1973, appellant was placed in special education, specifically an educably mentally retarded ("EMR") class, due to his score on the Stanford–Binet test. Appellant, at age six, did not know his age and thought he was nine. He was immature, did not know his address, and possessed functioning in the visual motor category at the three year, six month level. His reading and verbal skills were at the five-year-old level, and he

had a mental age of four years, six months. He was placed on medication, as he was also hyperactive. His intellectual functioning was in the third percentile as compared to the general population. Appellant was tested again on September 10, 1975. He was chronologically eight years and eight months. He tested at an overall 62, which at the time was categorized as educably mentally retarded. Appellant earned a mental age on the Stanford–Binet test of five years and six months. He was placed in the first stanine group or in the first percentile in comparison to the general population. He was deficient in reading at a 1.2 grade level, and his spelling was at a .6 grade-level equivalent. He indicated weakness in verbal reasoning and abstract thinking. He could not spell his last name correctly. It is noted in the evaluation that appellant "will be limited to his ability to generalize, to transfer learning from one situation to another, to do abstract reasoning or to do much self evaluation."

{¶ 118} Dr. Hammer testified that appellant tested in the mild mentally retarded range. Appellant's score of 48 on the Wechsler Intelligence Scale for Children at age 13 years and four months taken in May 1980 established him in the moderately mentally retarded range. His "relative weaknesses lie in not being able to recall everyday information, do abstract thinking, perform mental arithmetic, perceive a total social situation, perceive patterns and to reproduce symbols using psychomotor speed and coordination." He frequently engaged in behaviors such as making noises and faces when talking, rolling eyes to the back of his head, being restless and tired, working with pencil hanging out of mouth. He exhibits weaknesses in reasoning ability, originality, verbal interaction, and lack of intellectual independence.

{¶ 119} Appellant was tested again at his school on August 22, 1982. At 15 years old, his reading and math were at a third-grade level. The next psychological evaluation was performed by the juvenile court's psychologist at the request of Judge Norton for a bind-over proceeding on or about January 10, 1984. Appellant was accused of and later pleaded guilty to two rapes. In two years' time, he had amassed 13 juvenile felony charges. At age 17 and in ninth grade with a score of 55, Dr. Douglas Darnall, a psychologist for the Trumbull County Court of Common Pleas, opined that appellant was mildly mentally retarded and possessed "significant [deficiency] in his verbal functioning, possessed poor judgment, does not think of consequences, is highly suggestible." He also opined that appellant requires long-term structured rehabilitation, "Because of his passivity and limited intellectual ability he can easily be swayed." He also stated, "Danny does not comprehend the seriousness of his offenses." Dr. Darnall further opined in his report that "his level of adaptive functioning is poor. And he needs a highly structured facility that can provide programming for mentally retarded youth." Further, he stated that unfortunately, the record shows that

his family cannot provide such an environment. The probation department agreed and requested, due to his mental retardation and the risk of exploitation if placed in an adult facility, that the request for the bind over should be denied and that he should be placed in a group home and that "Danny will in time need to live in an adult halfway house which would be able to provide both social as well as vocational habilitation." The bind over was denied, and appellant was sentenced to TCY. On April 25, 1984, the chief psychologist at TCY, Dr. R.W. Jackson, opined in regard to retesting appellant as part of the intake procedure that he tested at a 65 IQ and described appellant as "intellectually limited, socially constricted youth with very few interpersonal coping skills, rather immature and self centered with needs of attention and approval of others." He also stated that "it appears that Danny will adjust himself to a well structured program. He is so easily led and willing to do what he is instructed to do." Furthermore, "In a structured program Danny could no doubt function quite well." Appellant's sentence was concluded after his 18th birthday. He was discharged in 1985 and was returned home to his mother, who is also mentally retarded, and reenrolled in school.

{¶ 120} Shortly after his arrest on the charges for which he has been convicted and sentenced to death, appellant, at the age of 18, scored a 68 on the Wechsler Adult Intelligence Scale Revised test. As part of the mitigation preparation, appellant was administered another test in which he scored a 64. At age 33, appellant submitted to an IQ test in prison on which he scored a 71.

{¶ 121} In the instant case, pursuant to the foregoing, appellant was found to be mentally retarded. The record establishes that appellant met the first prong of *Atkins/Lott* as evidenced by IQ scores below 70. The trial court properly found that appellant satisfied that prong.

{¶ 122} With regard to adaptive skills, the Supreme Court of Ohio in *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 13, recently stated:

{¶ 123} " '[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills * * * that became manifest before age 18.' *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242, 153 L.Ed.2d 335. Adaptive skills are those skills that one applies to the everyday demands of independent living, such as taking care of oneself and interacting with others. Adaptive behavior tests are designed to assess how a person applies those skills in the tasks of everyday life."

{¶ 124} The Supreme Court in *White* continued:

{¶ 125} "The mentally retarded are not necessarily devoid of all adaptive skills. Indeed, 'they may look relatively normal in some areas and have certain significant limitations in other areas.' Mildly retarded persons can play sports,

write, hold jobs, and drive.  \* \* \* [I]n determining whether a person is mentally retarded, one must focus on those adaptive skills the person lacks, not on those he possesses." *White*, 118 Ohio St.3d 12, 2008-Ohio-1623, 885 N.E.2d 905, at ¶ 65.

{¶ 126} Drs. Hammer, Olley, and Huntsman all agreed on a protocol for testing appellant in April 2004, and administered various tests, including the Wechsler Adult Intelligence Scale–III, the Test of Memory Malingering, Street Survival Skills Questionnaire, Woodcock–Johnson Tests of Achievement, and the Adaptive Behavior Assessment System–II.  All three experts agreed, after testing appellant, that the results were unreliable.  Thus, it became necessary to look at other sources, including historical data, to make a determination regarding appellant's mental retardation.  The historical data indicated substantial deficits in adaptive skills.

{¶ 127} The trial court, however, found that appellant is not mentally retarded, based upon his superior adaptive behavior.  The trial court stressed appellant's fluency with the language and his articulate presentations in interviews.  However, throughout his life, various examiners, including Risinger, have found that appellant had poor hygiene, was easily led, and was unable to provide his address and phone number.  All of the examiners who tested appellant before age 33, in preparation for the hearing, found him lacking in multiple adaptive areas.  Dr. Sparrow testified that although appellant may have a good vocabulary, adaptive-behavior communications do not measure level of vocabulary in any way.  Anyone who talks to him is "left in the dust" trying to figure out what he is talking about.  This shows a deficit in the adaptive behavior of language.

{¶ 128} The trial court compared appellant to other death row inmates.  However, pursuant to the AAMR, the diagnosis of mental retardation is relative to the general population.  Although appellant may be manipulative and a malingerer, he can still be and is mentally retarded.

{¶ 129} Appellant introduced the rebuttal testimony of Dr. Sparrow, one of the three authors of the Vineland Adaptive Behavior Scale, which was a revision of the Vineland Social Maturity Scale, and administered to appellant four times.  Although her credentials are very impressive, the trial court determined that Dr. Sparrow's rate of error in recasting the old Vineland scores was so high as to render her testimony inadmissible under *Daubert,* or alternatively, her testimony was rejected outright in favor of Dr. Hancock's opinion.

{¶ 130} In *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 592–593, 113 S.Ct. 2786, 125 L.Ed.2d 469, the court held that the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid" and can be applied to the facts at issue properly.  The court said that many considerations will bear on the inquiry, including whether the theory can be tested, whether it has been subjected to peer

review and publication, what its known or potential error rate is and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community. The inquiry is flexible, and its focus must be on principles and methodology, not on the resulting conclusions.

{¶ 131} Here, Dr. Sparrow testified about a linkage between the two tests. She indicated that within the control group of people taking both the old and new Vineland, she used a straight correlation between the scores. Dr. Sparrow stated that when two tests target the same areas, one can use this method to link and make a comparison of the scores. The technique at issue has been tested. The linkage data is included in the testing manual, so the methodology has gained general acceptance. Dr. Sparrow's testimony should not have been excluded. However, the error is harmless. Even without her testimony, the historical evidence is overwhelming in regard to adaptive deficits and mental retardation as observed and documented by both the juvenile court and the multiple evaluators at the Warren city schools and Brickhaven residential placement and the juvenile department of corrections TCY.

{¶ 132} The prior testing and independent observations demonstrate by a preponderance of the evidence that appellant's scores prior to the age of 18 satisfy the criteria for deficits in adaptive behavior with respect to the second standard under *Lott.*

{¶ 133} With regard to the onset before age 18, the trial court found that although appellant had an IQ in the mildly mentally retarded range, there was no evidence to show that he met the criteria of deficits in adaptive functioning. This is dehors the record. The trial court concluded this despite overwhelming evidence and evaluations to the contrary from a multitude of sources that he spent virtually all of his school years in programs for the mentally retarded. Appellant's IQ scores ranged from 48 to 70, during the time period when he was first tested at six years and two months, up to the age of 18. The record establishes that appellant had poor personal hygiene, was immature, behaved inappropriately, had difficulty making friends, lagged behind intellectually, and was consistently developmentally slow. Appellant committed serious crimes at the age of 17. However, the fact that he engaged in criminal conduct does not negate a diagnosis of mental retardation. The record supports the fact that appellant experienced the onset of mental retardation prior to the age of 18, thereby satisfying the third standard under *Lott.*

{¶ 134} Based on *Atkins,* executing a person with mental retardation status, regardless of context, violates the Eighth Amendment. Here, I believe the trial court abused its discretion in finding that appellant was not a person with mental

retardation, because he met the three *Lott* criteria for classification as mentally retarded.

{¶ 135} Accordingly, I would affirm in part, reverse in part, and remand the matter for resentencing under the statutory guidelines for noncapital cases of aggravated murder.