OPINION
{¶ 1} Appellant, Jerry R. Lawson, appeals the decision of the Clermont County Court of Common Pleas denying his petition for postconviction relief. For the reasons set forth below, we affirm the trial court's decision.
 {¶ 2} On April 26, 1988, appellant was convicted of two counts of aggravated murder with capital specifications, two counts of kidnapping, one count of aggravated robbery, and *Page 2 
two counts of intimidating a witness. The trial court subsequently approved the jury's recommendation and sentenced appellant to death for the aggravated murder of Timothy Martin. Appellant's conviction and sentence were upheld on direct appeals to this court, State v.Lawson (June 4, 1990), Clermont App. No. CA88-05-044, 1990 WL 73845, and to the Ohio Supreme Court, State v. Lawson, 64 Ohio St.3d 336,1992-Ohio-47. The United States Supreme Court denied appellant's petition for writ of certiorari on March 29, 1993. Lawson v. Ohio
(1993), 507 U.S. 1007, 113 S.Ct. 1653.
 {¶ 3} Following the United States Supreme Court's decision inAtkins v. Virginia (2002), 536 U.S. 304, 122 S.Ct. 2242, appellant filed a petition for postconviction relief claiming he is mentally retarded and, therefore, ineligible for the death penalty pursuant toAtkins. Appellant subsequently filed an amended petition to include a claim that he suffers from mental illness and is therefore ineligible for the death penalty regardless of whether he is mentally retarded. Appellant requested a jury trial to determine the issue of mental retardation, which the court denied on June 2, 2006.
 {¶ 4} On January 15, 2004, the state filed a motion for summary judgment as to all claims set forth in appellant's petition. Following a hearing on the motion, the trial court granted the state summary judgment as to appellant's claim of mental illness, but determined that appellant's claim of mental retardation presented factual questions requiring an evidentiary hearing. The trial court subsequently held an evidentiary hearing on August 30, 2006, and July 9, 2007, at the conclusion of which it found appellant had failed to prove by a preponderance of the evidence that he is mentally retarded. The trial court denied appellant's petition accordingly. Appellant now appeals the trial court's decision, advancing three assignments of error.
 {¶ 5} Assignment of Error No. 1:
 {¶ 6} "THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION *Page 3 
FOR A JURY TRIAL."
 {¶ 7} In his first assignment of error, appellant argues the trial court erred in denying his request for a jury trial as to his claim of mental retardation. Specifically, appellant avers that such ruling violates the Sixth and Fourteenth Amendments to the United States Constitution and Sections 5 and 10, Article I, of the Ohio Constitution because a determination of whether a defendant is mentally retarded, and eligible for the death penalty, requires judicial fact-finding. We disagree.
 {¶ 8} The Ohio Supreme Court recently addressed this issue inState v. Were, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 186. There, the defendant argued the United States Supreme Court's decisions inApprendi v. New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348, and its progeny demonstrate that the determination of whether a capital defendant is mentally retarded is a factor that eliminates the possibility of a death sentence, and must therefore be decided by a jury. In dismissing this argument, the Ohio Supreme Court explained that a finding that a capital defendant is not mentally retarded is not an aggravating circumstance that increases a defendant's sentence. Id. Rather, such a finding "simply means that the capital defendantremains eligible to be sentenced to death." Id. (Emphasis added.) The court therefore concluded that "the trial court, not the jury, determines whether a capital defendant is mentally retarded."
 {¶ 9} We find appellant's first assignment of error without merit on the basis of Were, and overrule the same accordingly.
 {¶ 10} Assignment of Error No. 2:
 {¶ 11} "THE TRIAL COURT ERRED BY DENYING APPELLANT RELIEF ON APPELLANT'S SECOND CAUSE OF ACTION: HIS MENTAL RETARDATION PRECLUDED THE STATE FROM EXECUTING HIM."
 {¶ 12} In his second assignment of error, appellant contends the trial court erred in *Page 4 
denying his petition for postconviction relief where it found he did not meet the clinical definition of "mentally retarded." We find appellant's argument without merit.
 {¶ 13} With respect to appellate review of postconviction proceedings, a "`trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence.'" State v. White, 118 Ohio St.3d 12,2008-Ohio-1623, ¶ 45, quoting State v. Gondor, 112 Ohio St.3d 377,2006-Ohio-6679. An "abuse of discretion" connotes more than an error of law or judgment, and implies the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 14} A capital defendant advancing a claim that he is mentally retarded, and therefore, death penalty ineligible, "bears the burden of establishing that he is mentally retarded by a preponderance of the evidence." State v. Lott, 97 Ohio St.3d 303, 2002-Ohio-6625, ¶ 21. "Clinical definitions of mental retardation * * * require (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18." Id. at ¶ 12; White at ¶ 8. The Ohio Supreme Court has instructed trial courts to "rely on professional evaluations * * * and consider expert testimony * * * in deciding" whether a capital defendant is mentally retarded. Lott at ¶ 18; White at ¶ 47. "A trial court is not required to automatically accept expert opinions offered from the witness stand, whether on mental retardation or on any other subject." White at ¶ 71. Nevertheless, "[w]hile the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave." Id. at ¶ 74.
 {¶ 15} In this case, experts, Dr. John Matthew Fabian and Dr. Michael Nelson, *Page 5 
evaluated appellant on October 21 and 22, 2005, in connection with the mental retardation proceedings at issue. Both experts testified during the hearing on the matter, with Dr. Fabian testifying on appellant's behalf and Dr. Nelson on the state's behalf. At the conclusion of the hearing, the trial court found that appellant failed to prove the first two criteria of mental retardation by a preponderance of the evidence, and denied his petition for postconviction relief accordingly.
 1. Subaverage Intellectual Functioning {¶ 16} With respect to the first criterion, significantly subaverage intellectual functioning is defined "as approximately two standard deviations below the mean" for the general population, "which is an IQ of 70 on the Wechsler scale and an IQ of 68 on the Stanford-Binet."Were, 2008-Ohio-2762 at ¶ 180. The Ohio Supreme Court has held "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70." Lott at ¶ 12.
 {¶ 17} Dr. Fabian testified that he and Dr. Nelson administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") IQ test to appellant during their evaluation in this case. Dr. Fabian indicated that appellant received a full scale IQ score of 73 on the examination, which, when recalculated to account for the "Flynn Effect," equated to a score of 67.65. According to Dr. Fabian, the "Flynn Effect" refers to IQ test scores increasing over time in the general population. Dr. Fabian opined that, within a reasonable degree of psychological certainty, appellant suffers from significantly subaverage intellectual functioning based upon his present IQ score of 67.65.
 {¶ 18} Dr. Nelson, however, testified concerning appellant's most recent IQ score, as well as previous IQ scores achieved by appellant. With respect to appellant's most recent score, Dr. Nelson indicated that appellant's adjusted score, taking into account the Flynn Effect, was 68.26. Nevertheless, Dr. Nelson opined that past scores must be considered in *Page 6 
making a diagnosis of mental retardation. In considering appellant's past test scores, Dr. Nelson testified that he only considered Stanford-Binet and Wechsler scale examinations, of which appellant has taken seven over the course of his life, because such examinations are considered the most reliable in determining IQ. The average of appellant's scores on such examinations was 76.45, taking into account the Flynn Effect and standard error of measurement. Accordingly, Dr. Nelson opined that appellant is not significantly subaverage in the area of intellectual functioning based upon his IQ.
 {¶ 19} Notably, Dr. Fabian testified in rebuttal that it is improper to consider past IQ test scores in determining intellectual functioning because of the potential for error created by the "practice effect." Dr. Fabian explained that practice effect is a "progressive error" that diminishes the reliability of an IQ test where an individual is tested repeatedly over time, because such individual is likely to retain some information and remember how to perform certain tasks. Dr. Fabian discussed short-term practice effect, which occurs when a person is tested within three to six months of a previous test, as well as long-term practice effect, which occurs when tests are administered over the course of years. Dr. Fabian acknowledged that short-term practice effect is better supported by research on the matter than is long-term practice effect.
 {¶ 20} In determining whether appellant had proven significantly subaverage intellectual functioning, the trial court considered all 13 IQ tests appellant has taken throughout his life, rather than only his most recent test or the seven examinations considered by Dr. Nelson. Such tests included those administered over the course of several years, from October 1959 to October 2005. In considering appellant's test scores, the court recognized the potential for practice effect on appellant's later scores, but indicated that any such effect would be minimized after one to two years. The court therefore found it inconclusive whether appellant's later scores resulted from practice effect, as such tests were administered after *Page 7 
several years had elapsed. The trial court found appellant's test scores from February 1988, December 1993, and March 1997, most significant. The 1988 test represented the first time appellant had ever taken the WAIS-R test, and 24 years had elapsed since he had previously been tested. Further, several years had elapsed before appellant was retested in 1993 and 1997. Appellant received a full score of 81, 84 and 82 on such tests, respectively.
 {¶ 21} Notably, the trial court found that appellant failed to establish his later scores were "skewed" as a result of long-term practice effect, as opposed to an increase in environmental stability and structure. The court further found that Dr. Fabian could not discount appellant's prior drug abuse, including his inhalation of Right Guard aerosol spray while incarcerated, as a potential factor in appellant's differing IQ scores. Ultimately, the court concluded that, even considering appellant's most recent IQ score only, appellant's "true" score could be as low as 62.65-63.26 or as high as 72.65-73.26, when considering the standard error of measurement, and that the record showed an equal likelihood of his IQ being above 70 as below 70. Accordingly, the court concluded that appellant failed to prove the first criterion of mental retardation, and failed to rebut the presumption that he is not mentally retarded with any credible evidence.
 {¶ 22} After reviewing the record, we find the trial court did not err in reaching this conclusion. As an initial matter, appellant has presented no case law in support of his position that a trial court may only consider a petitioner's most recent IQ score in determining intellectual functioning. Moreover, Dr. Nelson testified that an individual's true IQ is, in fact, best determined through averaging his past and present IQ scores. It is well-established that "[t]he weight to be given the evidence and the credibility of the expert witnesses are primarily for the trier of the fact." Were, 2008-Ohio-2762 at ¶ 178, citing State v. Nemeth, 82 Ohio St.3d 202, 211, 1998-Ohio-376. As such, the trial court was permitted to rely on Dr. Nelson's testimony in finding appellant failed to meet his burden of proving he is mentally retarded. *Page 8 
 {¶ 23} We note that appellant also argues that the trial court case simply rejected both experts' opinions in favor of its own judgment and perception of appellant, as the Ohio Supreme Court found impermissible in White. 2008-Ohio-1623, ¶ 70-74. Unlike in White, however, the record in this case demonstrates that the trial court considered and applied the testimony of each expert in its analysis of the issue of mental retardation, and chose to believe portions of each in determining appellant had failed to prove mental retardation by a preponderance of the evidence. As the trial court found, the record in this case demonstrates that appellant's most recent IQ score was not conclusively proven to be below 70, and that the average of all of appellant's IQ scores over the course of several years was well above 70. We find the trial court did not err in concluding appellant failed to prove he is mentally retarded in light of such evidence.
 2. Adaptive Functioning {¶ 24} The second criterion of mental retardation requires a petitioner to demonstrate significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction.Lott, 2002-Ohio-6625 at ¶ 12. As noted by one appellate district, "[t]he American Psychiatric Association's definition of mental retardation identified the following categories of adaptive skills: communication; self-care; home living; social/interpersonal skills; use of community resources; self-direction; functional academic skills; work; leisure; health; and safety. In 2002, the American Association on Mental Retardation ["AAMR"] distilled these categories into three broad groups of adaptive skills: conceptual adaptive skills; social adaptive skills; and practical adaptive skills. The [AAMR's] definition requires that a significant deficit in only one of these groups be demonstrated."State v. Hill, 177 Ohio App.3d 171, 2008-Ohio-3509, ¶ 77. In this case, Dr. Fabian testified as to the pre-2002 model of adaptive behavior, concluding that appellant is deficient in the areas of functional academics and self-direction. *Page 9 
 {¶ 25} As an initial matter, Dr. Fabian testified that he and Dr. Nelson administered the Wide Range Achievement Test, Third Version, to appellant to assess his academic ability. Appellant scored in the 8th percentile, or at the seventh grade level, with respect to reading, the 1st percentile, or third grade level, with respect to spelling, and .7 percentile, or third grade level, with respect to arithmetic. Dr. Fabian opined, and the state concedes, that appellant suffers from a significant limitation in the area of functional academics based upon appellant's test results.
 {¶ 26} Dr. Fabian also testified that he administered the Adaptive Behavior Scales, Residential Community, Second Edition, to appellant, which demonstrated that appellant is deficient in the area of self-direction. He indicated that he administered various hands-on tests to appellant, including asking him to count money and make change, button a jacket, use a telephone book, and find various locations on a map. Dr. Fabian indicated that appellant "struggled" with using a telephone book, specifically with respect to the scenarios of knowing what to look up if his car broke down and he needed to have it repaired, and finding a hotel. He also testified, however, that appellant was able to make change, find most areas on a map, and button a jacket.
 {¶ 27} Dr. Fabian also interviewed appellant's mother and three sisters with respect to this area of adaptive functioning, noting that the information he obtained was historical in nature. Appellant's family members described appellant as unreliable, irresponsible and in need of consistent guidance. They also indicated he had difficulty in understanding others and had to be spoken to slowly and with care. Dr. Fabian acknowledged that appellant's mother and sisters have not been able to observe appellant's behavior since he has been in prison. Nevertheless, based upon such interviews, as well as his testing of appellant, Dr. Fabian opined that appellant is "significantly impaired" in the area of self-direction.
 {¶ 28} Notably, Dr. Fabian acknowledged during the hearing that he assessed *Page 10 
appellant pursuant to the1992 AAMR definition of adaptive behavior, which includes ten areas of adaptive functioning and is normed against the mentally retarded population, rather than the 2002 AAMR version, which includes three domains and is to be normed against the general population. Dr. Fabian testified, however, that it did not matter which test the court chose to apply because there "is not a perfect adaptive test," and if the court were to question several different qualified experts with respect to adaptive behavior, the court would likely get more than one opinion.
 {¶ 29} Finally, on cross-examination, Dr. Fabian testified as to appellant's occupational history, acknowledging that appellant has held over 20 jobs, including a position as a truck driver. Dr. Fabian indicated, however, that a mentally retarded individual could do many of the jobs appellant has done, and that the multitude of jobs held by appellant demonstrated an impairment in this area of adaptive behavior.
 {¶ 30} Dr. Fabian ultimately concluded that appellant is "significantly impaired" in two or more areas of adaptive behavior, including functional academics and self-direction. Dr. Nelson offered no opinion as to appellant's adaptive functioning, as he opined that appellant's IQ demonstrates he is not mentally retarded.
 {¶ 31} In its analysis of this issue, the trial court noted the state's concession that appellant is deficient in reading, writing and language. The court therefore addressed the disputed area of self-direction, which is one of the areas included in the domain of conceptual adaptive behavior. In doing so, the court noted that Dr. Fabian tested appellant using the Adaptive Behavior Scales, Residential Community, Second Edition, which does not comport with the criteria proposed in the 2002 AAMR manual for the diagnosis of mental retardation, and is normed against the mentally retarded population only. The court concluded that, based upon such facts, it could not rely on Dr. Fabian's testing of appellant. The court further concluded that the hands-on test results obtained by Dr. Fabian were inconclusive, as *Page 11 
appellant was able to perform many of the tasks without difficulty but struggled with others such as using a telephone book.
 {¶ 32} The trial court also considered appellant's practical adaptive behavior, including his occupational skills. In doing so, the court again noted the absence of reliable data yielded from standardized testing normed on the general population. The court then discussed that appellant has held 20 jobs throughout his life, including working as a truck driver, carpenter, construction worker, roofer, carpet layer and sod layer, and has cohabitated with a woman for a period of time while assisting her in raising a child. The court ultimately contrasted each of the experts' testimony with respect to appellant's adaptive behavior, noting that mildly mentally retarded individuals could do many of the activities appellant has done, but that Dr. Fabian failed to factor appellant's drug use into his inability to perform certain tasks, such as using a telephone book. After considering such evidence, the trial court found that appellant had failed to prove the second criterion of mental retardation by a preponderance of the evidence.
 {¶ 33} After a careful review of the record, we cannot find the trial court erred in reaching this conclusion. Again, the trial court considered each of the experts' testimony with respect to the area of adaptive behavior in finding appellant failed to meet his burden of proving mental retardation. See White, 2008-Ohio-1623 at ¶ 71. Moreover, the record supports the trial court's finding that, absent reliable data yielded from "standardized measures normed on the general population," appellant failed to conclusively demonstrate the requisite deficiencies in adaptive behavior. We therefore find the trial court did not err in concluding that appellant failed to prove the second criterion to establish he is mentally retarded.
 3. Onset Before Age 18 {¶ 34} The final criterion a petitioner must prove to establish mental retardation is that *Page 12 
such condition was present before the age of 18. Lott, 2002-Ohio-6625 at ¶ 12. Dr. Fabian testified that none of appellant's school records indicate appellant was diagnosed with mental retardation prior to the age of 18. He suggested, however, that such a diagnosis would be unusual, and opined that appellant was mentally retarded before the age of 18 based upon collateral information, including psychological evaluations, school records, records of prior testing, and interviews with appellant's family.
 {¶ 35} Notably, Dr. Fabian also testified that appellant had participated in "huffing" while incarcerated by snorting or sniffing Right Guard aerosol spray. Dr. Fabian testified, however, that this information did not change his opinion with respect to this criterion because of appellant's low scores on intelligence tests during grade school and the fact he began learning disability classes in first or second grade. Again, Dr. Nelson offered no opinion as to this criterion based upon appellant's IQ score.
 {¶ 36} The trial court found that it need not address the matter of whether appellant was mentally retarded before the age of 18, where appellant failed to carry his burden in establishing the first two criteria of mental retardation. As stated, our review of the record demonstrates the trial court did not err in finding appellant failed to prove the first two criteria of mental retardation by a preponderance of the evidence.
 {¶ 37} Based upon the foregoing, we find the trial court did not abuse its discretion in denying appellant's petition for postconviction relief, where the court found, and the record supports, that appellant failed to prove he is mentally retarded by a preponderance of the evidence. Appellant's second assignment of error is therefore overruled.
 {¶ 38} Assignment of Error No. 3:
 {¶ 39} "THE TRIAL COURT ERRED BY DENYING APPELLANT RELIEF AND/OR AN EVIDENTIARY HEARING ON THE FIFTH CAUSE OF ACTION: THE SEVERITY OF HIS MENTAL ILLNESSES PRECLUDED THE STATE FROM EXECUTING HIM." *Page 13 
 {¶ 40} In his final assignment of error, appellant argues the trial court erred in denying his request for an evidentiary hearing as to his claim of mental illness, and granting the state summary judgment on the matter. Specifically, appellant contends his mental illness precludes the imposition of the death penalty, regardless of whether he is found to be mentally retarded. We find this contention without merit.
 {¶ 41} As stated, the decision to grant or deny a petition for postconviction relief is committed to the discretion of the trial court.State v. Sims, Clermont App. No. CA2005-08-077, 2006-Ohio-3091, ¶ 4;State v. Kruse, Warren App. Nos. CA2005-10-112, CA2005-10-113,2006-Ohio-2510, ¶ 5. Pursuant to R.C. 2953.21(C), "a trial court properly denies a defendant's petition for postconviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." State v. Calhoun,86 Ohio St.3d 279, 1999-Ohio-102, paragraph two of the syllabus.
 {¶ 42} In State v. Hancock, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 155-158, the Ohio Supreme Court declined to extend the Atkins
prohibition on executing mentally retarded individuals to individuals suffering from mental illness. In so concluding, the court acknowledged that an individual's mental illness may be considered as a mitigating factor during sentencing, thus satisfying the requirements of theEighth Amendment to the United States Constitution. Id. at ¶ 158. Moreover, the Ohio Supreme Court has upheld the imposition of the death penalty on mentally ill individuals in other cases, noting that mental illness is often treatable and that an offender may simply forgo treatment options. See State v. Ketterer, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 205-206.
 {¶ 43} Based upon the foregoing, we find the trial court did not err in dismissing appellant's claim of mental illness without an evidentiary hearing. Appellant's third *Page 14 
assignment of error is therefore overruled.
 {¶ 44} Judgment affirmed.
WALSH, P.J., and BRESSLER, J., concur. *Page 1